**OWENSBY & KRITIKOS, INC., Petro-Marine Engineering, Inc. & Subsidiaries, John W. Owensby & Dolores G. Owensby, Theodore A. Kritikos & Be Jo Kritikos, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 86-4073.

United States Court of Appeals, Fifth Circuit.

June 26, 1987.

Michael E. Guarisco, Guarisco, Weiler & Cordes, New Orleans, La., for petitioners.

David M. Moore, Atty., Marlene Gross, Acting Director, Roger M. Olsen, Acting Asst. Atty. Gen., Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Sec., Robert A. Bernstein, Atty., Tax Div., U.S. Dept. of Justice, Fred T. Goldberg, Jr., Chief Counsel, I.R.S., Washington, D.C., for respondent.

Before CLARK, Chief Judge, WISDOM, and HIGGINBOTHAM, Circuit Judges.

WISDOM, Circuit Judge:

This appeal presents a single question: whether the Tax Court committed clear error in ruling that amounts paid as compensation in 1978 and 1979 by the corporate appellants to the individual appellants were in part unreasonable. The Tax Court held that a portion of the amount paid was in reality a dividend rather than compensation for services rendered. We conclude that the Tax Court's finding of fact that the compensation paid was in part unreasonable is not clearly erroneous. We therefore affirm.

I.

The appellants in this case are two corporate taxpayers, Owensby & Kritikos, Inc. ("O & K") and Petro-Marine Engineering, Inc., and Subsidiaries ("PME"), and four individual taxpayers, John W. and Delores G. Owensby, and Theodore A. and Be Jo Kritikos.[1] The appellants are referred to collectively as the taxpayers and the Commissioner of Internal Revenue is referred to as the Commissioner.

Mr. Owensby and Mr. Kritikos are both civil engineers and both had substantial experience in the offshore construction engineering industry before they formed O & K in 1962. O & K was incorporated to provide engineering and consulting primarily to the oil and gas industry. Mr. Owensby and Mr. Kritikos each contributed $1,400 to the capital of O & K, and each received 50 percent of its stock. No additional capital has been contributed since O & K was formed, and the ownership has remained the same. Since incorporation, Mr. Kritikos has been the president of O & K, and Mr. Owensby has been the executive vice president. Together, they have constituted O & K's board of directors.

At the time of its formation and during its early years, O & K had only three employees—Mr. Owensby, Mr. Kritikos, and a draftsman. From the outset, Mr. Owensby and Mr. Kritikos worked long hours, often in harsh and sometimes dangerous conditions. During the years at issue, each worked 60 to 70 hours a week.[2] They were responsible for virtually all of O & K's business and were involved in all aspects of its operation. From 1974 through 1979, O & K grew substantially. By the end of 1979, it had 81 employees and offices in Gretna, Louisiana and Houston, Texas. O & K's revenues were derived from services such as consulting, drafting, and visual and nondestructive testing of drilling and production facilities; capital was not a material income-producing factor. During the years at issue, O & K's customers included the major oil companies, major independents, drilling companies, shipyards, and fabrication plants.

O & K entered into work agreements with Mr. Owensby and Mr. Kritikos in 1974. These agreements were amended in 1977. During the years at issue, each work agreement provided for a guaranteed annual salary of $72,000, an incentive bonus of three percent of the net volume of yearly business, and an additional bonus to be paid at the discretion of the board of directors. O & K also entered into work agreements with its two other key employees, Henry Witter and Huey Hinton. During the years at issue, Mr. Witter's work agreement provided for an incentive bonus of two percent of the net volume of business generated by his department and one-quarter of one percent of the net volume of business generated by O & K, plus one percent of the net volume of certain other work. Mr. Hinton's work agreement provided for an incentive bonus of one percent of the net volume of business generated by O & K in its New Orleans and Houston branches. The work agreements of Mr. Witter and Mr. Hinton also provided for additional bonuses to be paid at the discre-

---

1. Mrs. Owensby and Mrs. Kritikos are parties in this matter because each filed a joint tax return with her husband.

2. The hours worked by Mr. Owensby and Mr. Kritikos were spent performing services not only for O & K, but also for PME and a third corporation, Total Engineering Services Team, Inc.

tion of O & K. During its taxable years ending in 1978 and 1979,[3] O & K paid the following amounts as compensation to its top employees:

| Employee | Salary | 1978 Incentive Bonus | Discretionary Bonus | Total Compensation |
|----------|--------|----------------------|---------------------|--------------------|
| Owensby  | $72,000 | — | — | $152,760 |
| Kritikos | $72,000 | — | — | $152,760 |
| Hinton   | —[4] | — | — | $ 46,170 |
| Witter   | — | — | — | $ 37,520 |

| Employee | Salary | 1979 Incentive Bonus | Discretionary Bonus | Total Compensation |
|----------|--------|----------------------|---------------------|--------------------|
| Owensby  | $66,000 | $71,880 | $7,500 | $145,380 |
| Kritikos | $66,000 | $71,880 | $7,500 | $145,380 |
| Hinton   | $20,334 | $29,625 | $2,500 | $ 52,459 |
| Witter   | $16,883 | $22,304 | $2,500 | $ 41,687 |

In 1969, Mr. Owensby and Mr. Kritikos formed PME to provide consulting engineering services to the offshore petroleum and marine industries. PME was formed to separate the consulting engineering services then being performed by O & K from its visual inspection and nondestructive testing services, which O & K continued to perform. PME specializes in the design, feasibility planning, and construction management of marine structural, process, and pipeline projects. This work is highly specialized, and during the years at issue, PME provided service to most of the major oil companies. Capital was not a material income-producing factor for PME.

Since its incorporation, Mr. Owensby and Mr. Kritikos have each owned 50 percent of the stock of PME. Each initially contributed $1,000 to the capital of PME, and there have been no additional capital contributions. Since its formation, Mr. Owensby has been the president of PME and Mr. Kritikos has been the executive vice president. During the years at issue, Mr. Owensby, Mr. Kritikos, and Edmond Genois, the company's senior vice president, constituted the board of directors of PME.

During the early years of PME, Mr. Owensby and Mr. Kritikos performed most of the services the company provided, including engineering, drafting, and writing specifications. During the years at issue, they continued to engage in such activities, in addition to being primarily responsible for the company's sales and its employee recruiting and training. At the end of 1979, PME had 243 employees and offices located in Gretna and Lafayette, Louisiana, and Houston, Texas.

PME entered into work agreements with Mr. Owensby and Mr. Kritikos in 1974. During the years at issue, the work agreements provided for a guaranteed annual salary of $120,000, an incentive bonus of three percent of the net volume of yearly business, and an additional bonus to be paid at the discretion of the board of directors. PME also entered into work agreements with Mr. Genois and William Linder, PME's vice president of process engineering. During the years at issue, Mr. Genois's work agreement provided for an incentive bonus of one percent of the net volume of yearly business. For 1978, Mr. Linder's work agreement provided for an incentive bonus of one percent of net volume with a cap on the amount he could

3. Until 1979, O & K reported its taxable income based on a fiscal year ending on October 31. In 1979, O & K changed its fiscal year-end to September 30. The same is true for PME.

4. Specific breakdowns were not available for all forms of compensation in 1978.

receive. For 1979, Mr. Linder's work agreement provided for an incentive bonus of three-quarters of one percent of net volume multiplied by an efficiency factor.

During the taxable years ending in 1978 and 1979, PME paid the following amounts to its top employees:

| Employee | Salary | 1978 Incentive Bonus | Discretionary Bonus | Total Compensation |
|---|---|---|---|---|
| Owensby | $120,000 | $303,211 | $50,000 | $473,211 |
| Kritikos | $120,000 | $303,211 | $50,000 | $473,211 |
| Genois | ——[5] | —— | —— | $159,737 |
| Linder | —— | —— | —— | $138,833 |

| Employee | Salary | 1979 Incentive Bonus | Discretionary Bonus | Total Compensation |
|---|---|---|---|---|
| Owensby | $120,000 | $364,999 | $28,000 | $512,699 |
| Kritikos | $120,000 | $364,999 | $28,000 | $512,699 |
| Genois | $ 42,112 | $141,894 | $16,800 | $200,806 |
| Linder | $ 40,621 | $ 99,553 | $ 8,400 | $148,574 |

In 1970, Mr. Owensby, Mr. Kritikos, and Dick H. Piner[6] formed Total Engineering Services Team, Inc. ("TEST"), a subchapter S corporation,[7] to provide safety and environmental protection services for petroleum production platforms and facilities. Since its incorporation, Mr. Piner has owned 50 percent of TEST, and Mr. Owensby and Mr. Kritikos have each owned 25 percent. Their initial capital contributions totaled $1,000—$500 from Mr. Piner, and $250 each from Mr. Owensby and Mr. Kritikos. No additional capital has been contributed. Since its formation, Messrs. Piner, Owensby, and Kritikos have been, respectively, the president, vice president, and secretary/treasurer of TEST, and they have been the only members of its board of directors.

During the years at issue, TEST provided approximately 30 products and services. TEST's work is highly specialized and requires constant awareness of both technical developments and complex government regulations. TEST provides third-party testing of safety devices as well as safety training for the personnel of many of the

major oil companies. At the end of the 1978 calendar year, TEST had 244 employees and offices located in Louisiana, Texas, Oklahoma, and Alaska.

During the period at issue, Mr. Piner devoted his full attention to the work at TEST. Mr. Owensby and Mr. Kritikos were directly involved in the management of and securing sales for TEST. Much of the success of TEST can be attributed to the efforts of Mr. Owensby and Mr. Kritikos.

TEST entered into work agreements with Mr. Piner, Mr. Owensby, and Mr. Kritikos, beginning in 1975. Mr. Piner's work agreement provided for a guaranteed annual salary of $72,000, an incentive bonus of two percent of profits, and an additional bonus at the discretion of the board of directors. The work agreements of Mr. Owensby and Mr. Kritikos each provided for a guaranteed annual salary of $28,000, an incentive bonus of one percent of profits, and an additional bonus at the discretion of the board of directors. TEST also had a work agreement with David Manning, the execu-

---

**5.** See note 4.

**6.** Mr. Owensby, Mr. Kritikos, and Mr. Piner are not related by blood or marriage.

**7.** As a subchapter S corporation, TEST was not subject to corporate income tax, and its income, whether distributed or not, was taxed directly to its shareholders. See I.R.C. § 1373(b) (as in effect during the years at issue).

tive vice president of TEST. Mr. Manning's work agreement provided for an incentive bonus of three percent of TEST's profits.

During the years at issue, the bonus payments made by TEST to its key employees were not calculated according to the work agreements. Instead, Mr. Piner's bonus was initially determined by Mr. Owensby and Mr. Kritikos based on the evalua-tion of Mr. Piner's contribution to TEST; their determination was accepted by Mr. Piner. TEST's board of directors—Mr. Owensby, Mr. Kritikos, and Mr. Piner—then determined the bonuses of Mr. Owensby, Mr. Kritikos, and Mr. Manning.

During its fiscal years ending in 1978 and 1979, TEST paid the following amounts to its top employees:

1978

| Employee | Salary | Bonus | Total Compensation |
|---|---|---|---|
| Piner | $72,000 | $707,300 | $779,300 |
| Owensby | $28,000 | $200,000 | $228,000 |
| Kritikos | $28,000 | $200,000 | $228,000 |
| Manning | $36,924 | $ 79,510 | $116,434 |

1979

| Employee | Salary | Bonus | Total Compensation |
|---|---|---|---|
| Piner | $72,000 | $453,000 | $525,000 |
| Owensby | $28,000 | $157,000 | $185,000 |
| Kritikos | $28,000 | $157,000 | $185,000 |
| Manning | $53,443 | $ 52,230 | $105,673 |

During the years at issue, neither O & K nor PME paid any dividends. The only dividend paid by either O & K or PME prior to the years at issue was a dividend of $890,721 paid by PME in 1977.

For the years at issue, Mr. Owensby, Mr. Kritikos, and Mr. Piner received the following total compensation from the three corporations.

| | 1978 | 1979 |
|---|---|---|
| Owensby | $853,971 | $843,079 |
| Kritikos | $853,971 | $843,079 |
| Piner | $779,300 | $525,000 |

Following an examination of the income tax returns of the taxpayers and Mr. Piner, for the years at issue, the Commissioner determined that the amounts paid by each corporation as compensation to Messrs. Owensby, Kritikos, and Piner exceeded rea-sonable compensation for the services actually rendered by them.[8] In his notices of deficiencies, the Commissioner determined that reasonable compensation for each individual during the years at issue was as follows:

8. An earlier examination of the companies' returns for 1976 and 1977 did not result in the disallowance of any claimed compensation deductions.

|  | O&K | 1978 PME | TEST | Total |
|---|---|---|---|---|
| Owensby | $81,200 | $305,977 | $ 37,035 | $424,212 |
| Kritikos | $81,200 | $305,977 | $ 37,035 | $424,212 |
| Piner | -0- | -0- | $269,556 | $269,556 |

|  | O&K | 1979 PME | TEST | Total |
|---|---|---|---|---|
| Owensby | $112,492 | $299,981 | $ 46,185 | $458,658 |
| Kritikos | $112,492 | $299,981 | $ 46,185 | $458,658 |
| Piner | -0- | -0- | $283,844 | $283,844 |

Based on those determinations, the Commissioner asserted deficiencies in the taxes paid by the three individuals, O & K, and PME.[9]

The taxpayers and Mr. Piner disputed the differences determined by the Commissioner and filed a petition in the United States Tax Court. At trial, the sole issue was whether the amounts paid to Messrs. Owensby, Kritikos, and Piner constituted reasonable compensation for services actually rendered. After considering all of the evidence, the Tax Court found that the amounts paid by the corporations to these shareholder-employees during the years at issue exceeded reasonable compensation and were, in part, distributions of profits in the nature of dividends. The Tax Court concluded that the total maximum reasonable compensation for the years at issue was as follows:

|  | 1978 | 1979 |
|---|---|---|
| Owensby | $546,376 | $560,065 |
| Kritikos | $546,376 | $560,065 |
| Piner | $497,202 | $347,240 |

The decision of the Tax Court resulted in deficiencies for the corporations and the individuals. From that decision, the taxpayers now appeal.[10]

## II.

Section 162(a)(1) of the Internal Revenue Code permits a corporation to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered".[11] The Treasury Regulations amplify this code section as follows:

There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services.[12]

For large, publicly held corporations, the deductibility of compensation is seldom questioned, because the corporation is usually dealing at arm's length with its employees. In a small, closely held corporation, however, the issue arises more frequently. When, as here, the corporation's shareholders are its key employees, it is in the interest of all parties to characterize amounts distributed to the shareholder-em-

9. As discussed below, to the extent that the amounts paid exceed reasonable compensation, they are not deductible by the corporation and are taxable as dividend income to the individuals.

10. Mr. Piner did not appeal from the tax court's decision.

11. I.R.C. § 162(a)(1).

12. Treas.Reg. 1.162–7(a) (1960).

ployees as compensation rather than dividends. Compensation is deductible from the corporation's income tax; dividends are not. Moreover, from 1971 to 1981, which includes the years at issue in this matter, dividends were taxable to the recipient at a maximum rate of 70 percent, while the maximum tax rate for earned income during this period was 50 percent.[13] Because the shareholders will receive the profits of the business one way or the other, all parties prefer to characterize payments to shareholders as compensation. For that reason, a corporation may deduct compensation only to the extent that it is reasonable.[14]

██ Reasonableness of compensation paid by a corporation is a question of fact.[15] And each case turns on its own facts and circumstances.[16] In addressing the reasonableness issue, the trial court should consider a number of factors. *Mayson Manufacturing Co. v. Commissioner* [17] lists the following:

the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with gross income and net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; [and] the salary policy of the taxpayer as to all employees.[18]

No single factor is decisive of the question; rather the trial court must consider and weigh the totality of the facts and circumstances when making its decision.[19] The taxpayers note that the definition of the appropriate factors is reviewable as a question of law.[20] We conclude that the district court properly considered all of the appropriate factors and committed no error of law.[21] The Tax Court's finding of fact that the compensation paid to Mr. Owensby and Mr. Kritikos was in part unreasonable is therefore subject to the clearly erroneous standard.[22] It matters not that the question of reasonableness is an ultimate question of fact,[23] or that the determination is

---

**13.** I.R.C. § 1 (prior to amendment in 1983) and I.R.C. § 1348 (prior to repeal in 1981).

**14.** The payments also must be for services actually rendered. There is no question that the individuals rendered services for the corporations; therefore the tax court appropriately focused on whether the amounts paid were reasonable. *Elliott's Inc. v. Commissioner,* 716 F.2d 1241, 1244–45 (9th Cir.1983).

**15.** *Kennedy v. Commissioner,* 671 F.2d 167, 173 (6th Cir.1982); *Mayson Mfg. Co. v. Commissioner,* 178 F.2d 115, 119 (6th Cir.1949).

**16.** *Charles Schneider & Co. v. Commissioner,* 500 F.2d 148, 151 (8th Cir.1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); *Good Chevrolet v. Commissioner,* 36 T.C.M. (CCH) 1157, 1167 (1977).

**17.** 178 F.2d 115 (6th Cir.1949).

**18.** *Id.* at 119; *accord Kennedy,* 671 F.2d at 173; *Charles Schneider & Co.,* 500 F.2d at 153; *Good Chevrolet,* 36 T.C.M. at 1167; *see also Commercial Iron Works v. Commissioner,* 166 F.2d 221, 224 (5th Cir.1948). An additional factor considered in *Mayson Mfg. Co.* was "the amount of compensation paid to the particular employee in previous years". 178 F.2d at 119. Because the taxpayers have not argued that the payments in the years at issue were made in recompense

for underpayments in previous years, this factor is not particularly relevant in this controversy.

**19.** *Home Interiors & Gifts, Inc. v. Commissioner,* 73 T.C. 1142, 1156 (1980); *Pacific Grains, Inc. v. Commissioner,* 399 F.2d 603, 606 (9th Cir.1968); *Good Chevrolet,* 36 T.C.M. at 1167.

**20.** *Elliott's, Inc.,* 716 F.2d at 1245.

**21.** In *Elliott's, Inc.,* the United States Court of Appeals for the Ninth Circuit divided the factors into five broad categories: the employee's role in the company; a comparison of the employee's salary with those paid by similar companies for similar services; the character and condition of the company; the extent of a conflict of interest; and the internal consistency of salaries. *Id.* at 1245–48. For all intents and purposes, these are the same as the factors enumerated in *Mayson Mfg. Co.* Nonetheless, even if the factors enumerated in *Elliott's, Inc.* differed from those in *Mayson Mfg. Co.,* it is clear from the record that the tax court considered all of the factors mentioned in both cases.

**22.** *R.P. Farnsworth & Co. v. Commissioner,* 203 F.2d 490, 492 (5th Cir.1953); *Kennedy,* 671 F.2d at 174; *Charles Schneider & Co.,* 500 F.2d at 150; *Mayson Mfg. Co.,* 178 F.2d at 119.

**23.** *Byram v. United States,* 705 F.2d 1418, 1422–23 (5th Cir.1983).

based on inferences drawn from uncontradicted evidence;[24] the finding of the Tax Court must be affirmed unless clearly erroneous. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[25]

Restated, the issue before this Court is whether the Tax Court committed clear error in ruling that the payments made to Mr. Owensby and Mr. Kritikos as compensation were in part unreasonable. We note that the district court treated O & K, PME, and TEST as if they were subsidiaries of a single entity that paid for the services of Mr. Owensby and Mr. Kritikos. Both the taxpayers and Commissioner agree that this approach is appropriate. Although we shall generally follow this approach in our analysis, we are not constrained from examining the individual corporations as they relate to the hypothetical entity. We shall refer to O & K, PME, and TEST collectively as the corporations.

### A. *Shareholders as Employees*

We start our analysis with the principle that the Commissioner's determination of reasonableness carries a presumption of correctness;[26] the burden is on the taxpayer to show that he is entitled to a deduction larger than that allowed by the Commissioner.[27] When, as here, the payments are made to shareholder-employees who control the corporation, the trial court must carefully scrutinize the payments to ensure that they are not disguised dividends.[28] As the Treasury Regulations state:

Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services, and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock.[29]

In the instant case, the payments made to Mr. Owensby and to Mr. Kritikos corresponded exactly to their stockholdings.[30] The taxpayers argue, however,

**24.** *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 528 (1985); *accord McKinley v. Baden,* 777 F.2d 1017, 1019 (5th Cir.1985).

**25.** *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *see also Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1512, 84 L.Ed.2d at 528.

**26.** *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); *Tulia Feedlot, Inc. v. United States,* 513 F.2d 800, 805 (5th Cir.), *cert. denied,* 423 U.S. 947, 96 S.Ct. 362, 46 L.Ed.2d 281 (1975).

**27.** *Botany Worsted Mills v. United States,* 278 U.S. 282, 289–90, 49 S.Ct. 129, 131–32, 73 L.Ed. 379 (1929); *Tulia Feedlot, Inc.,* 513 F.2d at 805; *Miller Box, Inc. v. United States,* 488 F.2d 695, 700 (5th Cir.), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974).

**28.** *Tulia Feedlot, Inc.,* 513 F.2d at 805; *Logan Lumber Co. v. Commissioner,* 365 F.2d 846, 851 (5th Cir.1966); *Home Interiors & Gifts, Inc.,* 73 T.C. at 1156, *Good Chevrolet,* 36 T.C.M. at 1167.

The taxpayers argue that because Mr. Owensby and Mr. Kritikos each owned 50 percent of the stock of O & K and PME, and only 25 percent of the stock of TEST, neither controlled any of the corporations. We have no doubt, however, that the relationship between the shareholders and the corporations was sufficient to justify the tax court in subjecting the payment practices to careful scrutiny. *See* the cases cited above. This is especially true given the common interest of both the shareholders and the corporations in characterizing all payments as compensation rather than as dividends.

**29.** Treas.Reg. 1.162–7(b)(1) (1960); *see also Kennedy,* 671 F.2d at 175; *cf. Tulia Feedlot, Inc.,* 513 F.2d at 805.

**30.** Mr. Piner owned 50 percent of the stock of TEST, yet he received more than 50 percent of the amount TEST paid to its shareholder employees. As compared to Mr. Owensby and Mr. Kritikos, however, Mr. Piner was more than 50 percent responsible for the success of TEST and therefore merited higher compensation. Moreover, Mr. Piner apparently performed some ser-

that the evidence presented at trial demonstrated that Mr. Owensby and Mr. Kritikos were equally responsible for the success of the corporations and merited equal compensation. The taxpayers argue therefore that the correlation between stockholdings and payments is irrelevant. Although we agree that a correlation can be explained in this manner and that a trial court should consider this fact when making its decision,[31] we do not agree that the correlation becomes irrelevant once such an explanation is offered.

■ When the payments made are unquestionably at the high end of the spectrum of compensation paid within a field of work, the correlation between stockholdings and payments makes it necessary for the court to consider whether the payments are disguised dividends even if the shareholder-employees contributed services in proportion to their stockholdings. In such a case, it is not unreasonable for the court to conclude that a portion of the payments represent compensation for services and the remainder represents a disguised dividend. As noted before, the trial court must scrutinize payments made to shareholder-employees who control the corporation, especially when these payments are in proportion to stockholdings. As the regulations explain, however, even payments made to shareholders in proportion to their ownership are, as a general rule, improper only if they are in excess of what is usually paid for similar services.[32] We examine below whether the payments exceeded usual compensation for similar services.

### B. The Employees, the Employer, and the Economy

The trial court found and the Commissioner concedes that Mr. Owensby and Mr.

Kritikos are both highly motivated, uniquely skilled, and extremely productive individuals. Moreover, O & K, PME, and TEST are highly specialized companies performing a multitude of professional services within a complex industry. Mr. Owensby and Mr. Kritikos fill a variety of roles within these companies, acting as managers, salesmen, technicians, innovators, and public relations agents. There is no question that the remarkable growth and profitability of O & K, PME, and TEST can be traced directly to Mr. Owensby and Mr. Kritikos. The Commissioner also concedes that capital was not a material income-producing factor for any of the corporations and that, although the economic climate was favorable during the years at issue, the success of the corporations was due mainly to the efforts of Mr. Owensby and Mr. Kritikos. These factors point to the conclusion that Mr. Owensby and Mr. Kritikos should be compensated handsomely for their services.[33] Nonetheless, limits to reasonable compensation exist even for the most valuable employees.

### C. Compensation as a Percentage of Gross and Net Income

The record shows that the compensation paid by the corporations on a combined basis to the shareholder-employees in 1978 and 1979 constituted 12.3 percent and 9.0 percent respectively of the consolidated gross receipts and 53.7 percent and 65.1 percent respectively of the consolidated taxable income before deducting their salaries. Although it is often helpful to consider compensation as a percentage of both gross receipts and net income, the latter is in most cases more probative because it more accurately gauges whether a corpora-

---

vices for PME and was not paid for them by PME. We therefore decline to conclude that Mr. Piner's disproportionate participation in the payments made by TEST mitigates the probative value of the evidence that in the case of all of the corporations, Mr. Owensby and Mr. Kritikos received identical compensation and owned an identical amount of stock.

**31.** We note that the tax court obviously did consider the taxpayers' evidence on this point;

the court allowed identical compensation for Mr. Owensby and Mr. Kritikos.

**32.** Treas.Reg. 1.162–7(b)(1).

**33.** That Mr. Owensby and Mr. Kritikos personally guaranteed certain loans to the corporation also weighs in favor of munificent compensation. *R.J. Nicoll Co. v. Commissioner*, 59 T.C. 37, 51 (1972). The record is unclear, however, as to the amount or riskiness of these loans.

tion is disguising the distribution of dividends as compensation.[34]

■ The trial court noted the existence of a pattern on the part of the corporations as a consolidated entity to distribute most of their taxable income as compensation to their shareholder-employees. In *Good Chevrolet v. Commissioner*,[35] the Tax Court concluded that compensation to shareholder-employees constituting approximately 60 percent of net income was reasonable.[36] The taxpayers suggest that *Good Chevrolet* establishes a reasonableness benchmark and therefore strongly supports their position that the compensation paid by the corporations was reasonable. We must disagree. Even in *Good Chevrolet*, the Tax Court noted that 60 percent of net income was a "large portion".[37] More fundamentally, and as noted previously, each case turns on its own facts and circumstances. We conclude that in this case the large portion of net income paid in compensation to the shareholder-employees of the corporations was appropriately considered by the trial court as one factor pointing toward the conclusion that the compensation paid was in part unreasonable.

### D. *Dividend Practices and Return on Equity*

■ It is undisputed that the corporations paid no dividends during the years at issue. The taxpayers and the Commissioner dispute, however, the inference to be drawn from this fact. It is true that a closely held corporation may have valid business reasons for not paying dividends.[38] As the taxpayers' expert testified, such a corporation, especially one that is growing rapidly, may choose to retain its earnings to fuel future growth. The taxpayers' expert did not, however, offer any reason why these specific corporations chose not to pay dividends. Indeed, he specifically stated that PME, the largest of the corporations, was certainly in a position to pay a dividend during the years at issue. We reject the so-called automatic dividend rule—under which even reasonable compensation to shareholder-employees is automatically deemed to include disguised dividends if the corporation has been profitable and has not paid dividends.[39] We conclude, however, that the absence of dividend payments by a profitable corporation that has offered no specific reason for its failure to pay dividends is one of the factors a court may consider when addressing the reasonableness of compensation paid by that corporation to its shareholder-employees.[40]

■ A corporation's dividend practices should not, however, be viewed in a vacuum. An investor may garner a return on his investment through either dividends or appreciation in the value of his stock. For reasons acceptable under the tax code, many investors prefer stock appreciation over dividends. And indeed, many corporations with publicly traded stock pay no dividends. Therefore, the court should look not only at a corporation's dividend practices, but also at the total return the corporation is earning for its investors, its shareholders.[41] The prime indicator of the

---

34. Nonetheless, the absolute probative value of compensation as a percentage of net income as an isolated factor is often minimal. The main reason for this is that this factor is dependent upon a variable—the company's income—that, at least in the short run, may be unrelated to the value of an individual's services. For example, a company with high income might pay unreasonable salaries to its shareholder-employees; yet that compensation as a percentage of net income would be low because of the company's high income. On the other hand, a company with low net income might pay virtually all of that income to its shareholder-employees in salaries that are unquestionably reasonable.

35. 36 T.C.M. (CCH) 1157 (1977).

36. *Id.* at 1168–69.

37. *Id.* at 1168.

38. *See Elliott's, Inc.*, 716 F.2d at 1244.

39. *See Charles McCandless Tile Serv. v. United States*, 422 F.2d 1336, 191 Ct.Cl. 108 (1970). For a discussion of the fallacy of the automatic dividend rule, see *Elliott's, Inc.*, 716 F.2d at 1244.

40. *Cf. Home Interiors & Gifts, Inc.*, 73 T.C. at 1161.

41. *Elliott's Inc.*, 716 F.2d at 1246–47.

return a corporation is earning for its investors is its return on equity.

On a consolidated basis, the corporations' return on equity was 212.5 percent in 1978 and 47.6 percent in 1979.[42] These returns are impressive and are far in excess of the return on equity of most comparable, publicly traded corporations. As the taxpayers' expert testified, given the riskiness of this investment, an independent investor would undoubtedly be satisfied with such a return.

Relying on *Elliott's, Inc. v. Commissioner*,[43] taxpayers argue that if, after paying compensation to shareholder-employees, a corporation is earning a sufficient return to satisfy an independent investor, there exists a "substantial presumption" that compensation paid to shareholder-employees is reasonable. The taxpayers contend that the Tax Court erred in not considering this presumption.

■ We agree with the statement of the Ninth Circuit Court of Appeals in *Elliott's, Inc.* that if "the company's earnings on equity remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary".[44] We do not agree, however, with the taxpayers' interpretation of this statement as creating a "substantial presumption". The so-called independent investor test is simply one of the factors a court should consider, and in certain cases it may be a substantial factor. In this case, the Tax Court appropriately recognized the relevance of this factor and noted that it weighed in the taxpayers' favor.

### E. *Employment Under Work Agreements*

The taxpayers note that both men were paid in accordance with work agreements originally executed several years before the years at issue, and according to the taxpayers, this fact adds credence to their position that the compensation paid was reasonable. Under the work agreements, both men received a base salary from each corporation, an incentive bonus tied to corporate sales, and a discretionary bonus. As noted previously, the bulk of the compensation paid to the individual taxpayers was in the form of incentive or discretionary bonuses, which is generally considered contingent compensation. The Treasury Regulations state:

> The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.[45]

In general, because it is speculative, contingent compensation may exceed what would have been paid on a fixed and definite basis.[46] And contingent compensation paid under a longstanding arm's length agreement will usually be upheld even if an incentive formula results in greater compensation than the parties anticipated at the time they entered into the contract.[47] In such a case, the trial court should focus

---

**42.** Return on equity is, of course, calculated after deducting all amounts paid as compensation.

**43.** 716 F.2d 1241 (9th Cir.1983).

**44.** *Id.* at 1247; *cf. Home Interiors & Gifts, Inc.,* 73 T.C. at 1161.

**45.** Treas.Reg. 1.162–7(b)(2) (1960).

**46.** *Commercial Iron Works,* 166 F.2d at 224.

**47.** *Elliott's, Inc.,* 716 F.2d at 1248; *Kennedy,* 671 F.2d at 174.

**1328**

not on the reasonableness of the actual amount paid, but rather on the reasonableness of the incentive formula at the time the parties entered into the agreement.[48]

■ We note that the Tax Court questioned whether an incentive bonus tied to company performance is needed for an employee who is also a shareholder. Apparently, the argument is that such an employee already has sufficient incentive to make the business successful because as a shareholder he will receive the profits of the business anyway.[49] This argument, however, misses the economic realities of the corporate form as taxed under the internal revenue code. For compensation purposes, the shareholder-employee should be treated like all other employees. If an incentive bonus would be appropriate for a nonshareholder-employee, there is no reason why a shareholder-employee should not be allowed to participate in the same manner. In essence, the shareholder-employee is treated as two distinct individuals for tax purposes: an independent investor and an employee. If he uses his role as an investor improperly to influence his compensation, the compensation will likely be declared unreasonable. On the other hand, his status as a shareholder should not be used to prohibit him from receiving the appropriate return on this labor, and this return may well include an incentive bonus.[50] Any error committed by the Tax Court in questioning the need for an incentive provision in the work agreements of Mr. Owensby and Mr. Kritikos was, however, harmless. The record is clear that the Tax Court concluded that the existence of the work agreements with their incentive provisions provided little insight with respect to the reasonableness of the total compensation paid. As we explain below, this conclusion is correct.

■ As noted above, we recognize that the existence of a reasonable, longstanding, consistently applied compensation plan negotiated at arm's length often provides evidence that the compensation paid pursuant to that plan was reasonable. In the present case, the negotiations between the corporations on the one hand and Mr. Owensby and Mr. Kritikos on the other were never at arm's length; together, Mr. Owensby and Mr. Kritikos controlled the board of directors of each of the corporations.[51] Nonetheless, the incentive provisions in the work agreements were apparently reasonable when negotiated. Although this constitutes evidence that the incentive bonus portion of the compensation paid was reasonable,[52] it is far from dispositive on the broader question presented by this case: whether the total compensation was reasonable. Indeed, the value of this evidence is diminished significantly by the fact that Mr. Owensby and Mr. Kritikos each received from the corporations in the form of "discretionary bonuses", $250,000 in 1978[53] and $192,500 in

---

**48.** See cases cited *supra* note 47. Although the court should focus on the reasonableness of an incentive formula when negotiated, a taxpayer cannot expect an antiquated incentive formula to protect incentive bonuses from scrutiny. If the employment contract has been renewed with the incentive provision unchanged notwithstanding that the circumstances had changed to such a degree that a company not controlled by top employees would likely have renegotiated the original incentive provision to make it more accurately reflect the value of the employee's services, the court may take this in mind in considering the reasonableness of a longstanding incentive formula.

**49.** *See University Chevrolet Co. v. Commissioner,* 16 T.C. 1452, 1455 (1951) ("For a sole owner to pay himself a bonus as an incentive to do his best in managing his own business is nonsense."), *aff'd,* 199 F.2d 629 (5th Cir.1952).

**50.** *Elliott's, Inc.,* 716 F.2d at 1248.

**51.** *Cf. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,* 528 F.2d 176, 181 (10th Cir. 1975); *Hammond Lead Products, Inc. v. Commissioner,* 425 F.2d 31, 33 (7th Cir.1970).

**52.** We do not address whether the incentive provisions had become unreasonable because of changed circumstances. *See supra* note 48.

**53.** The record does not divide the bonus paid by O & K in 1978 into its two components: incentive bonus and discretionary bonus. To give the taxpayers the benefit of the doubt, we have assumed that the total bonus paid by O & K included no discretionary bonus. It is therefore likely that the actual total discretionary bonuses paid in 1978 exceeded $250,000.

1979. Given that Mr. Owensby and Mr. Kritikos together exerted substantial influence over these "discretionary bonuses", these amounts were not the result of a longstanding compensation formula and could hardly be considered contingent compensation in the fullest sense of that term. Additionally, such substantial bonuses declared at year-end when the earnings of a business are known usually indicate the existence of disguised dividends.[54] This is even more true when, as here, the corporation has a history of distributing as compensation to its shareholder-employees the bulk of its profits.[55]

■ The taxpayers have also argued that the longstanding existence of work agreements is relevant for another reason. In 1976 and 1977, the Commissioner audited the taxpayers, and declared no deficiency. The taxpayers contend that the Commissioner's acceptance of the compensation paid in those years as reasonable constitutes evidence that the compensation paid in the years at issue was also reasonable. According to the taxpayers, this follows because the compensation during the entire period was calculated under identical work agreements. The Tax Court, however, properly declined to assign this fact significant probative value. By accepting a practice in an audit, the Commissioner does not necessarily approve that practice for use in the future.[56] And contrary to the position of the taxpayers, that the Commissioner chose not to assert deficiencies following the previous audit does not necessarily indicate that the IRS accepted the *manner* in which compensation was determined. Rather, it merely indicates that the IRS concluded that it would not be worthwhile to assert that the *amount* of compensation paid was unreasonable.[57] Although in certain cases, reliance on compensation practices previously allowed by the Commissioner may show good faith, it is not decisive in determining reasonableness.

■ For these reasons, we conclude that the existence of work agreements provides little, if any, evidence in this case that the total compensation paid to the shareholder-employees was reasonable.

### F. Compensation of Nonshareholder-employees

The Tax Court noted that even when compared to the shareholder-employees of each corporation, the employees who were not shareholders were compensated handsomely, and the court stated that this factor weighed in the taxpayers' favor. We must remember, however, that we are considering the corporations as a single entity in this case. We must compare the compensation paid by the entity as a whole to the nonshareholder-employees to that paid to its shareholder-employees. Although the record shows that the top nonshareholder-employees received compensation from only one of the corporations, Mr. Owensby and Mr. Kritikos received compensation from all three.[58] This factor is

---

54. *Cf. Pacific Grains, Inc.,* 399 F.2d at 605–07.

55. As noted, the corporations paid over half of their net income to their shareholders in the form of compensation.

56. *Walker v. Commissioner,* 362 F.2d 140, 142–43 (7th Cir.), *cert. denied,* 385 U.S. 865, 87 S.Ct. 124, 17 L.Ed.2d 92 (1966); *Burford-Toothaker Tractor Co. v. Commissioner,* 192 F.2d 633, 634 (5th Cir.1951), *cert. denied,* 343 U.S. 941, 72 S.Ct. 1033, 96 L.Ed. 1347 (1952). *But see Kennedy,* 671 F.2d at 175 (noting that Commissioner had not challenged compensation practices in previous years when the incentive bonus in question was yielding little income). We note that in *Kennedy,* the employee was apparently receiving a portion of the compensation in the years in question to offset insufficient compensation paid in previous years.

57. Even if the Commissioner had been convinced from the beginning that the terms of the work agreements were unreasonable, it is likely that his position would have been weak had he attacked as unreasonable the compensation paid in 1976 and 1977. The total compensation paid by the companies to the shareholder-employees was $1,330,736 and $1,362,388 in 1976 and 1977 respectively. That amount increased dramatically to $2,487,242 and $2,211,158 in 1978 and 1979 respectively. This increase not only strengthened the Commissioner's position, but also raised the stakes involved and thereby increased the Commissioner's incentive to challenge the payments.

58. For this reason, it is not particularly appropriate to compare the percentage of profits allowed as a bonus in the incentive provisions of the work agreements of Mr. Owensby and Mr.

significant because a key issue in this controversy is whether the entity as a whole pays top dollar to all of its employees, shareholder- and nonshareholder-employees alike. That issue is discussed below.

### G. Compensation Practices of Comparable Companies

After reviewing all of the above factors, the district court concluded that the most important factor in this case was what similar enterprises in similar circumstances would pay for similar services. The Treasury Regulations recognize that in a case like the instant one, the central inquiry often focuses on the market value of the services rendered:

> In any event the allowance for the compensation paid may not exceed what is reasonable under all of the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances.[59]

At trial, both parties presented expert testimony as to what a like enterprise would pay for like services. The Tax Court discounted the testimony presented by the

Commissioner's experts and chose instead to credit the testimony of the taxpayers' experts. The Tax Court refused, however, to accept the ultimate conclusion of the taxpayers' experts. The taxpayers assert that this was erroneous. We have examined the testimony of the taxpayers' expert witnesses and their report, and for the reasons explained below, we conclude that the Tax Court did not err.

The Taxpayers' experts identified 23 publicly traded corporations engaged in either the consulting engineering field or the oil exploration and production field as comparable companies with compensation information available. These companies were then placed in three categories: companies with revenues under $10,000,000; companies with revenues between $10,000,000 and $30,000,000; and companies with payment practices in the top quartile of the 23 companies. In each category, the experts calculated the average amounts the top three executives could expect to earn in cash and stock options [60] for an outstanding performance.[61] For the years at issue, and for the $10–30 million and top 25 percent categories, the figures were as follows:

---

Kritikos to the percentage in the incentive provisions of the work agreements of nonshareholder-employees. The latter employees apparently devoted their full time and attention to only one of the corporations, while Mr. Owensby and Mr. Kritikos divided their time among all three.

**59.** Treas.Reg. 1.162–7(b)(3) (1960); *cf. Logan Lumber Co.*, 365 F.2d at 850–51; *Mayson Mfg. Co.*, 178 F.2d at 121; *Good Chevrolet*, 36 T.C.M. at 1168.

**60.** The Commissioner concedes that the value of stock options granted to employees in public

companies should be considered in determining what like enterprises paid for like services.

**61.** The taxpayers effectively admit that by calculating the amount that would be paid for an outstanding performance, the experts accounted for the fact that Mr. Owensby and Mr. Kritikos were largely responsible for the tremendous success of the corporations.

**1979 Outstanding Performance**

| | Highest Paid | Second Highest Paid | Third Highest Paid |
|---|---|---|---|
| $10–30 million | $ 546,376 | $364,502 | $363,415 |
| Top 25% | $1,019,924 | $649,253 | $520,591 |

**1979 Outstanding Performance**

| | Highest Paid | Second Highest Paid | Third Highest Paid |
|---|---|---|---|
| $10–30 million | $560,065 | $311,580 | $305,970 |
| Top 25% | $992,868 | $614,013 | $513,899 |

The taxpayers' experts argued that Mr. Owensby and Mr. Kritikos should each be compensated as the highest paid executive in the top 25 percent category. Or in other words, reasonable compensation for each was up to $1,019,924 in 1978 and $992,868 in 1979.[62] These experts concluded that the appropriate category was the top 25 percent, because the corporations paid cash compensation to all of their employees, both shareholders and nonshareholders, at the top of the spectrum of that paid by the 23 companies. The Tax Court concluded, however, that because the corporations on a consolidated basis had revenues of $20,-226,385 and $24,555,167 in 1978 and 1979 respectively, the appropriate category for comparison was the $10–30 million in revenue category. It therefore concluded that reasonable compensation for each of the individual taxpayers for 1978 and 1979 was $546,376 and $560,065 respectively.

The taxpayers argue that such a conclusion is unwarranted. The taxpayers contend that because the Tax Court found the taxpayers' experts highly qualified and experienced, it was required to accept their testimony *in toto*. The judgment of the Tax Court as a finder of fact is, however, not so constrained. Even when the Tax Court accepts the general methodology of a highly qualified expert witness, the court may reject the expert's ultimate conclusion if the record does not support that conclusion.[63] Moreover, this is not a case where the Tax Court's decision to reject the taxpayers' experts' ultimate conclusion enjoys no support in the record.[64] Indeed, our review of the record convinces us of the propriety of the Tax Court's choice.[65] In this case, the Tax Court did not substitute its own judgment for that of the expert. Rather, the court appropriately relied upon the experts for information that the experts were able to provide. The court then arrived at its ultimate conclusion based on commonsense rather than lemminglike reliance upon the testimony of the experts.

Although we have concerns about the method of calculation used by the taxpayers' experts,[66] we accept their methods of

**62.** We emphasize that the experts concluded that those amounts represented the maximum reasonable compensation.

**63.** Cf. *Helvering v. National Grocery Co.*, 304 U.S. 282, 294, 58 S.Ct. 932, 938, 82 L.Ed. 1346 (1938) (the tax court's role is "[t]o draw inferences, to weigh the evidence and to declare the result...."); *Barry v. United States*, 501 F.2d 578 (6th Cir.1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975); *Tripp v. Commissioner*, 337 F.2d 432, 434 (7th Cir.1964).

**64.** Cf. *R.P. Farnsworth & Co., Inc.*, 203 F.2d at 492; *J.H. Robinson Truck Lines, Inc. v. Commissioner*, 183 F.2d 739, 740 (5th Cir.1950).

**65.** *Anderson*, 470 U.S. at 573–74, 105 S.Ct. at 1511–12, 84 L.Ed.2d at 528 (a court reviewing for clear error must make its decision "in light of the record viewed in its entirety").

**66.** We have at least three concerns about the taxpayers' experts' methods of calculation. First, the value of stock options granted to employees in the comparable companies was not calculated by determining their fair market value at the time they were granted. Rather, the experts valued the options at one-half the amount the employee would have received had he exercised the option at the point during the applicable period at which the stock price was

calculating the cash compensation and the value of stock options granted as well as their choice of comparable companies, because the district court did so and the Commissioner has not challenged that conclusion. The only question, therefore, is whether the corporations as a consolidated entity should be compared to the top 25 percent category or to the $10–30 million in revenue category.

■ We note that the Tax Court failed to articulate clearly or convincingly its reasons for rejecting the top 25 percent category. Indeed, the muddled reasons apparently offered by the Tax Court are refuted by that court's own opinion. But, in the circumstances of this case we will not overturn the Tax Court's conclusion with regard to this factor because the record unquestionably supports that conclusion.

When a taxpayer in a case such as this asserts that it merits treatment different from the norm—in this case, the norm is the $10–30 million in revenue category—then it must offer some support for that position. In this case, the taxpayers asserted that their overall cash compensation practices entitled them to be treated as a top 25 percent category company. Although it may well be true that the corporations as a consolidated entity paid average cash compensation to all of their employees that would put the entity at the top

of the group of the 23 comparable companies, the important question, however, is how does it rank in regard to total compensation. Because the corporations pay only cash compensation while the comparable corporations compensate their employees with both cash and stock options, comparing only cash compensation will of course place the corporations as an entity at the top of the group in terms of payment practices.[67] When comparing total compensation, however, it is clear that the corporations are not necessarily in the top echelon. Indeed, the taxpayers' experts' study, which was admitted into evidence at trial, states that based on total compensation for 1978 and 1979, the highest paid nonshareholder-employees of the corporations "would be considered underpaid when compared to [similarly situated individuals in] publicly held companies who provide stock option opportunities. This is especially true during the four-year period included in our study."[68]

A review of the total compensation paid to the shareholders of the corporations as compared to that paid to the top nonshareholder-employees demonstrates that the corporations as an entity should not be compared to the top 25 percent category. In 1978 and 1979, the corporations, on a consolidated basis, paid the following amounts to the highest paid employees:

---

the highest. We question whether this method of calculation adequately reflects the value of the options as perceived by both the employee and the market at the time the options were granted.

Second, the experts calculated the compensation for both Mr. Owensby and Mr. Kritikos based on the amount that would have been paid to the single highest paid executive in a corporation rather than on the average of the compensation of the two highest paid executives. The experts did testify that some companies paid their top two people identically, but they did not comment as to how this affected the amounts paid.

Finally, although the 1979 fiscal years of O & K and PME included only eleven months, the experts apparently calculated their compensation based on a full 12 month period.

We note that all three of the methodology selections about which we have concerns benefitted the taxpayers.

**67.** The taxpayers cannot have it both ways. If the value of stock options is to be included in the compensation paid to employees in comparable companies for purposes of calculating maximum reasonable compensation within a category, the value of the stock options must also be used in determining the appropriate category for comparison.

**68.** The taxpayers' experts' report also stated: "Stock option gains represented a major portion of total compensation in the oil and gas industry during the years involved in this study." It is clear that an overwhelming majority of the comparable corporations compensated their executives with stock options.

Total Compensation for Highest .Paid Employees

| Owensby | $853,971 | $843,079 |
|---|---|---|
| Kritikos | $853,971 | $843,079 |
| Piner | $779,300 | $525,000 |
| Genois | $159,737 | $200,806 |
| Linder | $138,833 | $148,574 |

The disparity between the compensation paid to the shareholders—Mr. Owensby, Mr. Kritikos, and Mr. Piner—and that paid to the nonshareholders is patent. In 1978, the *average* shareholder-employee was paid $829,081, while the *highest paid* nonshareholder-employee received less than 20 percent of that amount. In 1979, the highest paid nonshareholder-employee earned only 27 percent of that paid to the average shareholder-employee. The report of the taxpayers' experts supports the conclusion that such wide variances in compensation do not generally exist in comparable publicly held companies. According to the experts' report, in all categories and for all performances, even the third highest paid employee always received at least 50 percent of that earned by the highest paid employee.[69]

Because the taxpayers failed to prove that the companies as an entity provided total average compensation to all employees in the top quartile of the group of comparable companies, the record supports the Tax Court's decision to compare the corporations as an entity to the $10–30 million in revenue category rather than to the top 25 percent category.

### H. *The Amalgam of the Factors*

Based on a comparison to the $10–30 million in revenue category and after considering all of the other factors, the Tax Court concluded that reasonable compensation for Mr. Owensby and Mr. Kritikos was the average amount the highest paid executive could expect to earn, according to the taxpayers' experts, for an outstanding per-

formance for a company in the $10–30 million in revenue category—$546,376 in 1978 and $560,065 in 1979.

We conclude that the Tax Court's decision is not clearly erroneous. Although a different finder of fact might have concluded that the compensation was reasonable, a review of the evidence indicates that the Tax Court's decision is supported by the record, and we are not "left with the definite and firm conviction that a mistake has been committed".[70] The individual taxpayers were highly qualified and largely responsible for the tremendous success of the corporations in a highly specialized and complex field. And even after making the compensation payments to the shareholders, the corporations earned an impressive return on equity. On the other hand, the burden of proof is on the taxpayers. Mr. Owensby and Mr. Kritikos were controlling shareholders and were paid in direct proportion to their stockholdings. The corporations paid no dividends during the years at issue and paid a large portion of net income to their shareholders as compensation. The corporations on a combined basis had revenues of approximately $20 million in 1978 and $25.5 million in 1979. Although the companies paid their non-shareholder-employees well, the highest paid of these employees received only a fraction of the amount paid to the average shareholder-employee. Given this record and given that the Tax Court accepted the methodology of the taxpayers' experts, the court was therefore justified in limiting reasonable compensation to the amounts calculated by the taxpayers' own expert as

**69.** Those figures are displayed in part in our chart exhibiting the taxpayer's experts' conclusions as to the amount an employee could expect to receive for an outstanding performance.

**70.** *United States Gypsum Co.,* 333 U.S. at 395, 68 S.Ct. at 542.

reasonable compensation for an outstanding performance by the highest paid executive working for a company in the $10–30 million in revenue category, $546,376 and $560,065 in 1978 and 1979 respectively. On the record before us, the Tax Court's decision that the compensation paid to Mr. Owensby and Mr. Kritikos—$853,971 to each in 1978 and $843,079 in 1979—was in part unreasonable is therefore not clearly erroneous.

## CONCLUSION

We conclude that the Tax Court properly defined the factors for consideration in assessing the reasonableness of the compensation paid to Mr. Owensby and Mr. Kritikos. We also conclude that the Tax Court's application of those factors in the light of the evidence presented was not erroneous. Finally we conclude that the Tax Court's finding of fact that the compensation paid to Mr. Owensby and Mr. Kritikos was in part unreasonable is supported by the record and not clearly erroneous. The judgment of the Tax Court is therefore AFFIRMED.