C.T.I. INCORPORATED, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
C.T.I. Inc. v. Commissioner
Docket No. 21493-91
United States Tax Court
T.C. Memo 1994-82; 1994 Tax Ct. Memo LEXIS 83; 67 T.C.M. (CCH) 2261; February 24, 1994, Filed *83 Decision will be entered under Rule 155. For petitioner, John P. Edgar, Timothy R. Stock, and William C. McClure. For respondent, Donna P. Leone. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined a $ 252,640.13 deficiency in petitioner's Federal income tax for its taxable year ended June 30, 1988; a $ 12,632.01 addition to tax under section 6653(a)(1)(A), [1] and 50 percent of the interest due on the deficiency under section 6653(a)(1)(B); and a $ 64,275.62 addition to tax under section 6661. The issues presented for our consideration are: (1) Whether any portion of the bonuses paid to petitioner's two officers/employees is reasonable compensation and deductible; and (2) whether petitioner is liable for additions to tax under sections 6653(a)(1)(A) and (B) and 6661. FINDINGS *84 OF FACT The parties have entered into a stipulation of facts, along with exhibits, all of which are incorporated by this reference. At all times pertinent to this case, petitioner, C.T.I. Inc. (CTI), was an Ohio corporation with its principal place of business in Indiana, Pennsylvania. During the taxable year ended June 30, 1988, CTI paid its president, Eduardo Calderon (Mr. Calderon) and vice president, Ines Calderon (Mrs. Calderon), compensation for which respondent disallowed deductions, as follows: Employee
Salary
Bonus
Total
Disallowed
Mr. Calderon
[1] $ 28,750
$ 537,000
$ 565,750
$ 531,250
Mrs. Calderon
[1] 33,750
184,000
217,750
177,250
Total disallowed 708,500
Mr. and Mrs. Calderon have been married since 1972. Prior to 1976, Mr. Calderon had acquired a bachelor's degree in electrical engineering *85 and additional education involving electrical testing and telecommunications. He was employed for 9 years by Multi-Amp Engineering Services Corporation (Multi-Amp) as a service/test engineer. In that job he performed testing and startup procedures for nuclear, fossil, and hydro power plants. Mr. Calderon, along with other Multi-Amp employees, incorporated CTI during 1976 with total initial capitalization of $ 11,500. By the end of 1976, Mr. Calderon was dissatisfied with the arrangements and he obtained a bank loan and purchased the interests of the other former Multi-Amp employees, thereby becoming CTI's sole shareholder. Beginning in 1977, Mrs. Calderon joined Mr. Calderon and they were CTI's only employees for a number of years. At all times pertinent, the only officers of CTI were Mr. and Mrs. Calderon, as president and vice president, respectively. CTI began expanding during 1984 (to 3 employees) and employed about 11 people during 1988. At times, CTI hired as many as 150 electricians as hourly contract employees. CTI provided highly specialized electrical engineering, testing, calibration, and repair services principally to large electric power generating stations. *86 During the early years, as the sole technical employee of CTI, Mr. Calderon individually performed engineering, testing, calibration, and repair services for customers. From CTI's inception, work was performed for Pennsylvania Electric Co. (Penn) and Mr. Calderon was away from home a large amount of the time. Penn has always been CTI's biggest client. CTI was under annual contracts with Penn and provided preventive maintenance, cleaning, testing, and routine type procedures. CTI was also brought in to handle emergency situations. Sometime in 1984 or 1985, Mr. Calderon was approached by one of Penn's engineers to perform services on a project larger than those in which CTI had been previously involved. It involved the testing of a 13,800 volt switchgear at Penn's Keystone Generating Station (Keystone). From this point on CTI began expanding, receiving bigger projects, and hiring more employees. CTI also did work for the Bureau of the Mint, U.S. Treasury Department; the Water Authority at Kiski; and the Federal Aviation Administration. Mr. Calderon performed the following activities as an officer and employee of CTI: Calculating and coordinating the installation of electrical *87 systems; preparing and presenting proposals to potential customers; sales; personnel management; research; selection and purchase of electrical equipment; training power plant employees to use electrical equipment; testing equipment; and purchasing and implementing computer systems. Mr. Calderon's profession exposes him to unusually dangerous conditions, including the potential for great bodily harm. During his years of work with high-voltage electrical devices he has been involved in several accidents, including an incident where a 14,400 volt electrical charge caused serious burns on his face and arm. Mr. Calderon works long hours and is principally responsible for the success of CTI. Because of CTI's contract with Penn to handle emergencies, Mr. Calderon was on call 24 hours each day, including weekends. On occasion, he would have to work on resolving two different emergencies at the same time. During the fiscal year ended June 30, 1988, Mr. Calderon's working hours approached 4,000 hours. Without his technical ability; reputation with clients (especially Penn) for reliability and technical expertise; sales and management effectiveness; and financial support and know how, *88 CTI would not have been profitable. During the period under consideration, Mr. Calderon worked on the equipment at major generating plants. The plants contained coal-fired turbine generators with enough output to simultaneously light 8.5 million 100-watt light bulbs (850,000 kilowatts). These generating systems involve complex, high-voltage electrical equipment. On occasion, some equipment essential to the generation of electric power fails or burns down and the generator must be shutdown. Penn would call in Mr. Calderon and at times it would be necessary for him to work "around-the-clock" to complete the repair and to start-up the generating equipment. Mr. Calderon has specialized expertise that was not available amongst about 200 plus employees at each of the generating plants. On occasion, he would have to manufacture a special part, which was not otherwise available, to quickly repair electrical equipment. Mr. Calderon had demonstrated himself able to resolve the most complex problems confronting an electrical generating plant. When the generating plants were not functioning, the electric company faced a $ 300,000 daily loss of revenue and a $ 500,000 cost of replacement *89 power from other companies. Penn has relied solely on CTI for electrical work because other providers of service have not compared with the quality and responsiveness CTI provided. Penn's willingness to contract with CTI is attributable to Mr. Calderon's involvement. In those circumstances, Penn paid a premium rate to CTI. During the fiscal year ended June 30, 1988, Mr. Calderon and CTI's employees worked on four major projects for Penn. In connection with certain of those projects, Mr. Calderon developed specialized techniques to rehabilitate certain parts of Penn's switching gear. Part of Penn's equipment began to deteriorate, leaking insulation material and impairing or possibly disabling the equipment. This was a problem that occurred in older model equipment and had been resolved in newer equipment which was available. When this problem occurred, Penn was confronted with two alternatives: (1) Order the new-improved equipment ranging from $ 2.5 million to $ 2.8 million per unit and requiring 6 months lead time for delivery and 18 months before it could be installed, or (2) contract with CTI to have Mr. Calderon rehabilitate the equipment at a cost from $ 400,000 to $ 700,000 *90 per unit. The rehabilitation job would be accomplished over a 6- to 8-week period. Mr. Calderon devised a method for replacing the damaged insulation material, designed and implemented a temporary power system for the plant, and successfully completed the rehabilitation and repair of the equipment, mostly during a scheduled shutdown for maintenance. Concerning the insulation material, he first had to determine its consistency. This was information that the manufacturer would not disclose, so extensive testing was necessary to test the properties of the material. Various effective chemicals were used for which the approval of governmental regulatory authorities had to be obtained. Each project unit involved 3 busses (electric transmission mediums) with from 18 to 22 parts per buss including 50 breakers and 6 ceramic insulator units per buss. In addition to his individual performance, Mr. Calderon directed and managed other CTI employees on various jobs throughout each year. Mrs. Calderon earned a bachelor's degree and also attended seminars involving bookkeeping and business administration. From 1965 through June 1973 she worked in the design department of a clothing company, *91 eventually becoming the head designer in the lingerie department. She ceased working while she was pregnant with her fifth child and began working with CTI in 1977. Mrs. Calderon was responsible for operating and managing CTI's office. More specifically, she was responsible for bookkeeping, correspondence, billing, invoicing, and office administration. Up until 1985 when CTI and its activity and employees increased, Mrs. Calderon's responsibilities were more modest and she received no compensation from CTI until 1983. Mrs. Calderon, as an officer and employee of CTI, had autonomous authority over all operational aspects of CTI's office and administrative matters. During the 1988 year she managed such matters as: Administrative personnel records for the employees of CTI; keeping records and attending to details for as many as 150 electricians occasionally hired by CTI for its projects; directing the work of the clerical staff; generally overseeing the ongoing processing of materials at the shop, including such matters as the use of chemicals on the insulation replacement project; ordering, purchasing, and expediting of parts for jobs; carrying out Mr. Calderon's instructions; *92 contacting vendors and customers; and handling correspondence, including assistance in the proposal process. Mrs. Calderon worked long hours, arriving before most employees and remaining after other employees left for the day. She, like Mr. Calderon, considered herself on call 24 hours a day. Mrs. Calderon acquired certain basic and general knowledge about electric generating plant components so she could supervise some of the shop activities done in CTI's office and assist occasionally on job-site locations. CTI's reported gross receipts, total assets, and taxable income after considering the compensation in controversy for the fiscal years 1985 through 1988 were, as follows: Fiscal Year Ended
Gross Receipts
Total Assets
Taxable Income
June 30, 1985
$   519,795
$   125,277
$ 17,221
June 30, 1986
1,154,165
154,109
49,975
June 30, 1987
1,482,423
580,512
224,994
June 30, 1988
2,695,733
1,180,911
[1] 63,411
As of 1988, CTI employed 11 *93 employees, including Mr. and Mrs. Calderon. Other than the Calderons, the employees included two general engineers, four service engineers, one repairman, and two clerical employees. The clerical employees, repairman and one of the general engineers received hourly rates of compensation ranging from $ 6.73 to $ 8.33 per hour. The remaining engineers (general and service) received hourly rates of compensation ranging from $ 13.02 to $ 17.87. Three of the nine employees received no bonus and four of the remaining six employees received modest bonuses ranging from $ 300 to $ 500. The two remaining engineers received a bonus of $ 3,900 and $ 7,000. Other than the Calderons, the highest paid employee received total wages of $ 41,169 for the 1988 calendar year. CTI, from its inception, had not declared a dividend. Mr. and Mrs. Calderon received total compensation from CTI reportable for their calendar taxable years 1976 through 1988, as follows: Year
Mr. Calderon
Mrs. Calderon
1976
$   9,700.00
0
1977
12,264.74
0
1978
23,078.40
0
1979
36,000.00
0
1980
24,000.00
0
1981
24,000.00
0
1982
20,820.00
0
1983
24,000.00
$   1,999.98
1984
26,749.98
3,999.98
1985
212,499.96
10,899.98
1986
53,000.00
32,000.00
1987
103,750.00
33,750.00
1988
554,894.77
204,621.57
*94 In the earlier years the amount of compensation paid to the Calderons was limited by the amount of business revenue earned by CTI. When Mr. Calderon left Multi-Amp during 1976 he was earning about $ 42,000, including benefits. He did not attain that level of compensation with CTI for 9 years or until 1985. Mr. Calderon's total compensation for CTI's fiscal years ended June 30, 1985, 1986, and 1987, was $ 185,000, $ 80,750, and $ 150,000, respectively. Of those amounts, $ 150,000, $ 46,250, and $ 115,500, respectively, were yearend bonuses. Mrs. Calderon's total compensation did not include any bonuses for CTI's fiscal years ended June 30, 1986, and 1987. CTI reported shareholder's equity of $ 63,732, $ 113,707, $ 292,014, and $ 291,690 for its fiscal years ended June 30, 1985, through its fiscal year ended June 30, 1988, respectively. OPINION Section 162(a)(1) allows a deduction for ordinary and necessary business expenses including "a reasonable allowance for salaries or other compensation for personal services actually rendered". There is a two-prong test for deductibility under section 162(a)(1): (1) The amount of the compensation must be reasonable; and (2) the payments *95 must in fact be purely for services. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. on another matter and remanding T.C. Memo. 1980-282. The inquiry into reasonableness is a broad one and generally subsumes the inquiry into compensatory intent. Id. at 1245. Whether compensation is reasonable is a question to be resolved on the basis of an examination of all the facts and circumstances of a case. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), affg. T.C. Memo. 1973-130; Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 605 (9th Cir. 1968), affg. T.C. Memo. 1967-7. The determination of the Commissioner is presumptively correct, and the burden of proving the reasonableness of compensation is upon the taxpayers. Botany Worsted Mills v. United States, 278 U.S. 282 (1929). Many factors are relevant in determining whether compensation is reasonable, and no single factor is decisive; the totality *96 of facts and circumstances must be weighed. Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949). We find this case to present a purely factual inquiry that may be resolved in accord with established legal precedent. In the notice of deficiency, respondent determined that CTI was entitled to deduct the base salary paid to Mr. and Mrs. Calderon. The 1988 calendar year base salary for Mr. and Mrs. Calderon was $ 34,500 and $ 40,500, respectively; and respondent allowed $ 28,750 and $ 33,750, respectively, due to CTI's 1988 fiscal year. Respondent disallowed the bonuses paid to Mr. and Mrs. Calderon in the amounts of $ 537,000 and $ 184,000, respectively. On brief, respondent conceded that reasonable annual compensation for Mr. Calderon was more than the $ 34,500 allowed, but that the outside limit was $ 226,260, the maximum amount concluded to be reasonable by respondent's expert witness. With respect to Mrs. Calderon, respondent continues to maintain the position that a $ 40,500 annual salary was reasonable compensation for the "primarily administrative duties" she performed and that the $ 184,000 bonus was not reasonable. Because *97 1988 was "a demanding year", however, respondent agrees that "a [50-percent] bonus would be appropriate", so that $ 60,000 would constitute reasonable compensation for Mrs. Calderon's services. Respondent's expert concluded that Mrs. Calderon's maximum reasonable annual compensation would not exceed $ 111,160, but that $ 62,050 was a more appropriate salary based upon statistical analysis. Each party offered an expert witness who provided standards to find the amount of reasonable compensation deductible by petitioner for its 1988 fiscal year. Both experts were well qualified, but each advanced a different approach. Respondent's expert (expert R) approached the subject by means of a statistical analysis consisting of what he thought were comparable corporate executive compensation sources. Expert R attempted to narrow the statistical data to the service industry and more specifically to service businesses engaged in architecture and engineering. Petitioner's expert (expert P) did not find statistical comparables helpful primarily because of the unique expertise, reputation, and individual effort of the subject officers/employees. Predictably, both experts emphasized the position *98 or approach that supported the party from whom they received their compensation. Because Mr. Calderon's efforts and ability were so directly and uniquely responsible for CTI's success, we hold that the $ 226,000 maximum amount concluded by expert R does not represent a cap on the reasonable compensation in this case. We look to expert P's more individualized approach to supplement expert R's purely statistical result. First, we note expert P's observation that expert R's general statistical analysis is less relevant because comparable engineering consulting businesses are largely owner-operated businesses, which do not generally participate in compensation surveys. Expert P estimated that of approximately 400,000 engineers, about 20 percent of them own more than 50 percent of a company. Expert P pointed out that expert R used general survey data which mainly contains the reported data for less comparable companies that tend to participate in compensation surveys. We consider here a service company with little or no emphasis on capital. Moreover, the significant technical aspects of this business are provided by one individual (Mr. Calderon) and the total number of professional *99 and support employees is relatively small. In this type of situation the success of the organization is due to individual performance and that performance may be directly compensated within the meaning of section 162. See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1325 (5th Cir. 1987), affirming T.C. Memo. 1985-267. With respect to Mr. Calderon, his unique expertise, reputation and efforts were the primary reason for any success experienced by CTI. We were convinced by the testimony of Penn employees that Mr. Calderon was the primary, if not the sole reason that CTI acquired its contractual relationships with Penn. Additionally, Penn was the source of substantially all of CTI's revenue. We are cognizant that CTI's gross revenues jumped from about $ 500,000 for the fiscal year ended June 30, 1985, to well into the $ 1 million range for the fiscal years ended June 30, 1986 and 1987. More significantly, CTI's revenues nearly doubled for the fiscal year ended June 30, 1988, approaching $ 3 million. The solutions to the crises involving Penn's insulators was devised and implemented by Mr. Calderon. This project *100 and related emergency situations were the reason for the extraordinary increase in CTI's revenue. We recognize that Penn looked to CTI because Mr. Calderon's known and tested expertise would be available to Penn at a substantial cost savings when compared to the replacement cost of the equipment. Expert R's analysis did not fit Mr. Calderon's situation because it portrayed the average executive who heads up a more typical business operation, but is not as directly responsible for the company's success. In this setting, Mr. Calderon's situation is more comparable to that of a professional athlete. His personal efforts, highly-specialized experience, and technical ability permitted CTI to receive these extraordinary revenues during the fiscal year under consideration. Because of these factors it is appropriate to consider CTI's performance as directly related to Mr. Calderon's efforts and in relation to the bonus paid to him. An analysis of CTI's return on equity, pretax net income (without considering executive compensation) as a percent of revenues, and shareholder return on capital are helpful to this analysis. Expert P provided average percentages for comparably sized companies *101 and compared them to CTI, as follows: Performance Measure
Average Company
CTI (pre-bonus)
Return on equity
20.0%
212.0%
Net income -- revenues
5.5%
22.9%
Shareholder return
12.3%
31.0%
It can been seen that CTI performed substantially better than average comparably sized companies. Mr. Calderon's expertise and services performed for Penn is responsible for that successful financial result. Penn's generator down time has a $ 500,000 per day cost factor, and the approach invented by Mr. Calderon saved Penn millions of dollars in potential costs to purchase electrical power from other companies and/or loss of income from sales of electrical power. Although we agree with some of the underlying theory of expert P's approach, we do not agree that the entire amount claimed by CTI as Mr. Calderon's compensation was reasonable. We do not agree that petitioner has established that for prior years Mr. Calderon was underpaid so that for the 1988 fiscal year, to some degree, there should be compensation for his past services. Expert P determined reasonable prior years' compensation by increasing Mr. Calderon's $ 42,000 salary received for his services in the year prior *102 to his involvement in CTI by 10 percent for inflation each year. This was compared to the actual salary paid by CTI for the same period, and it was concluded that the difference was underpaid salary. On this record, although we have taken CTI's ability to pay salary and bonuses into consideration, we cannot accept the premise that there must be an inflation increase to reasonable compensation in each year or that the appropriate amount of the increase is 10 percent per annum. Modernage Developers, Inc. v. Commissioner, T.C. Memo. 1993-591. Additionally, we do not have sufficient information in the record to evaluate the amount of reasonable compensation for years other than CTI's 1988 fiscal year. To be sure, beginning in the 1985 fiscal year, the Calderons received substantially larger amounts of compensation than they did in the earlier, leaner years of CTI, but petitioner has not shown how much, if any, of those increases is attributable to making up any deficiencies caused by CTI's inability to pay adequate compensation in the earlier years, if any such deficiency did exist. We hold that reasonable compensation for Mr. Calderon during CTI's *103 fiscal year ended June 30, 1988, is $ 400,000. As a test of our factual finding and holding, we focus upon petitioner's emphasis on the exceptionally long hours worked by Mr. Calderon, an amount approaching 4,000 hours for the period under consideration. Respondent counters that the record reflects that going rate for technicians/engineers in petitioner's field and geographical area was $ 50 per hour. Although it may not always be appropriate to measure executive compensation by means of an hourly scale, that approach is germane in the case of professional services such as those rendered by Mr. Calderon. He was both a manager and an engineer. Based upon approximately 4,000 hours and $ 400,000 compensation, his hourly rate would have been about $ 100, a reasonable amount considering his responsibility and expertise, as compared to a $ 50 rate for an average engineer/employee. With respect to Mrs. Calderon the record does not reflect that her skills or efforts were as responsible for CTI's success. Although Mrs. Calderon also worked an extraordinary number of hours, she played a less significant and less technical role in CTI's success. Her performance and services were more *104 in line with that of the average executive portrayed by expert R's statistical analysis. Under those circumstances we are more inclined to follow expert R's approach with respect to Mrs. Calderon. Mrs. Calderon was responsible for the bookkeeping, administrative and general office management, and the support provided under her supervision was essential to the success of CTI for the 1988 fiscal year. Respondent's expert concluded that Mrs. Calderon's maximum reasonable annual compensation would not exceed $ 111,160, but that $ 62,050 was a more appropriate salary based upon statistical analysis. Because of her role in the special projects with Penn and because she devoted an unusually large amount of time to the business activity during the 1988 fiscal year, we find that $ 80,000 is reasonable compensation for Mrs. Calderon. Finally, we consider whether petitioner is liable for the additions to tax under sections 6653(a)(1)(A) and (B) and 6661. Respondent determined that petitioner is liable for an addition to tax for negligence or intentional disregard of the rules or regulations in both taxable years. Petitioner bears the burden of showing that respondent's determination is *105 in error. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Considering the facts of this case, petitioner has shown that $ 480,000 of the $ 771,000 claimed for salary and bonuses in regard to the Calderons, or about 62 percent of the amount claimed, was reasonable. Evaluation of whether petitioner in this setting was negligent or intentionally disregarded the rules and regulations is a factual pursuit. Considering the circumstances of this case and especially the testimony of the Calderons, we find that petitioner is not liable for the additions to tax under section 6653(a)(1)(A) or (B) for its 1988 fiscal year. Section 6661 provides for an addition to tax equal to 25 percent of the amount of the underpayment attributable to a substantial understatement. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 10,000. Section 6661(b)(1). The amount of any understatement is reduced to the extent the understatement is attributable to an item for which there is substantial authority (sec. 6661(b)(2)(B)(i)) or if there is adequate disclosure of the item (sec. 6661(b)(2)(B)(ii)). *106 Respondent, relying upon the standards set forth in Rev. Proc. 88-37, 1988-2 C.B. 560, concedes that there was adequate disclosure in petitioner's Schedule E, as part of its Form 1120 regarding Mr. Calderon's compensation. The revenue procedure provides guidance concerning adequate disclosure for purposes of section 6661. Relying on the same revenue procedure, respondent contends that there was not adequate disclosure for the compensation paid to Mrs. Calderon because words "as needed" had been reported as the percentage of time devoted to the business. In this regard, 100 percent had been reported for Mr. Calderon. In all other respects, respondent agrees that the revenue procedure had been complied with. Section 4(b)(4) of Rev. Proc. 88-37, 1988-2 C.B. 560, 561, regarding the reasonableness of officers' compensation states as follows: "Form 1120, Schedule E, must be completed when required by instructions. The time devoted to business must be expressed as a percentage as opposed to 'part' or 'as needed.'" (Emphasis supplied.) Although a revenue procedure would not preclude us from finding *107 that use of the term "as needed" could constitute adequate disclosure for purposes of section 6661, we find that it was not adequate disclosure in this case. Accordingly, we consider whether there was substantial authority for petitioner's reporting position as it relates to Mrs. Calderon's compensation. The standard for substantial authority is set forth in section 1.6661-3(a)(2), Income Tax Regs., as follows: The substantial authority standard is less stringent than a "more likely than not" standard (that is, a greater than 50-percent likelihood of being upheld in litigation), but stricter than a reasonable basis standard (the standard which, in general, will prevent imposition of the penalty under section 6653(a), relating to negligence or intentional disregard of rules and regulations). Thus, a position with respect to the tax treatment of an item that is arguable but fairly unlikely to prevail in court would satisfy a reasonable basis standard, but not the substantial authority standard.
We consider this standard only with regard to the compensation paid to Mrs. Calderon, because respondent has agreed that there was adequate disclosure with respect to Mr. Calderon's *108 compensation. We have held that $ 80,000 is reasonable compensation for Mrs. Calderon and petitioner claimed about $ 217,000 as her compensation. Accordingly, just under two-thirds of the compensation claimed for Mrs. Calderon is not allowable. Considering her skills, duties, and other factors, which are discussed supra, we find that there was not substantial authority for petitioner's reporting position regarding Mrs. Calderon. Accordingly, to the extent that the disallowed amount attributable to Mrs. Calderon's compensation exceeds the threshold of section 6661, petitioner is liable for an addition to tax under section 6661 on the underpayment attributable to that understatement. To reflect the foregoing and concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
1. Respondent disallowed all amounts in excess of the corporate authorized salaries of $ 34,500 and $ 40,500 for Mr. and Mrs. Calderon, respectively. Because the Calderons reported tax based on a calendar year and CTI on a fiscal year, the amount of base salary reflected as allowed by respondent varied from the calendar year amounts.↩
1. Petitioner reached partial agreement with respondent after completion of the audit for the taxable year ended June 30, 1988, which would have increased reported taxable income for that period to $ 79,123.92.↩