DEXSIL CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dexsil Corp. v. Commissioner
Docket No. 1349-93
United States Tax Court
T.C. Memo 1995-135; 1995 Tax Ct. Memo LEXIS 181; 69 T.C.M. (CCH) 2267; March 28, 1995, Filed *181 Decision will be entered under Rule 155. For petitioner: Paul L. Behling, William J. Doyle, and Charles P. Reed. For respondent: Meryl Silver. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in and an addition to the income tax of petitioner as follows: Tax Year
Addition to Tax
Ended Deficiency
Sec. 6651(a)(1)
9/30/89
$ 82,739
-  9/30/90
174,207
$ 8,710
After concessions, the issues for decision are whether deductions claimed by petitioner for salary, bonuses, and director's fees for Theodore R. Lynn (Lynn) during the taxable year ended September 30, 1989, and for Lynn, Timothy D. Lynn (T.D. Lynn), and Theodore B. Lynn (T.B. Lynn) during the taxable year ended September 30, 1990, exceed reasonable compensation for services rendered. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time the petition was filed, the principal *182 place of business of petitioner was Hamden, Connecticut. During the years in issue, the stock of petitioner was owned as follows: Lynn
61.62%
Jocelyn S. Lynn (J.S. Lynn)
10.12%
T.D. Lynn
8.37%
Andrew C. Lynn
5.63%
T.B. Lynn
4.99%
J.S. Lynn was the wife of Lynn; the others were sons of Lynn and J.S. Lynn. The remainder of the stock of petitioner was owned by unrelated parties. Dexsil Corporation was formed by Lynn and John Churchill (Churchill) in 1977. Lynn and Churchill each contributed $ 7,000 to the initial capital of petitioner. Lynn was graduated from Pennsylvania State University with a degree in chemical engineering and had previously been a co-founder of Analabs, Inc., a company that sold chemicals for gas chromatography. The name of petitioner stems from its original product, Dexsil, a high-temperature polymer used for gas chromatography. Lynn had learned that Olin Corporation, the original manufacturer of Dexsil, no longer intended to manufacture Dexsil and that the product line was for sale. Lynn and Churchill aspired to develop other uses for Dexsil and to produce it at a lower cost. Lynn and Churchill were not successful in lowering the production *183 cost of Dexsil. In 1981, Lynn purchased Churchill's interest in petitioner for $ 5,000 in cash and a $ 15,000 promissory note. As of July 1981, Lynn was president of petitioner. In 1982, Lynn became aware that the General Electric Company (GE) was researching, on behalf of the Electric Power Research Institute (EPRI), "field use determination of PCB's in transformer oil". PCB, which stands for "polychlorinated biphenyl", was considered to be an environmental hazard and thus was an Environmental Protection Agency (EPA) regulated contaminant. The standard method for testing transformer oil for PCB levels was to send a sample of the transformer oil to a laboratory and test it on a gas chromatograph. Lynn realized that the development of a device that enabled utilities to determine, on site, whether the transformer oil contained hazardous amounts of PCB's would be beneficial, because such a product would eliminate the need for expensive laboratory testing. In 1982, Lynn met with David J. Fisher (Fisher), a research chemist at GE, who told Lynn of his ideas relating to the chemistry of a "test kit". In June 1982, Dexsil and GE entered into a development contract that provided that *184 Dexsil would produce PCB test kits. The development contract noted that GE had a contract with EPRI entitled "Field Use Determination of PCB's in Transformer Oil"; that GE had already conceived of certain inventions relating to a PCB test kit; that a patent had been opened in the name of Fisher; and that any inventions or discoveries made by Dexsil would become the property of EPRI. During the summer of 1982, Lynn hired his son T.D. Lynn and hired Stephen R. Finch (Finch), a friend of T.D. Lynn. Both T.D. Lynn and Finch were on summer break from college, where they were studying chemical engineering and chemistry/biochemistry, respectively. Under the supervision of Lynn, T.D. Lynn and Finch performed experiments relating to the chemistry and design of the test kits. In March 1983, Lynn hired another friend of T.D. Lynn, Robert F. Cavanagh, Jr. (Cavanagh), to assist in the development of the test kit. Through the team effort of Lynn, Fisher, T.D. Lynn, Finch, and Cavanagh, Dexsil was able to develop a workable test kit using the chemistry developed by Fisher. Eventually, the test kit was perfected and became the "Clor-N-Oil" kit. The patent for the Clor-N-Oil test kit was issued *185 in the name of Fisher, and the EPRI was the assignee of that patent. On June 29, 1983, petitioner and EPRI executed a license and royalty agreement that provided petitioner with the right to produce and sell the Clor-N-Oil kit. Petitioner paid dividends in 1982 and 1983. In 1983, Lynn, on behalf of petitioner, applied to the Connecticut Product Development Commission for a $ 200,000 loan; the commission gave petitioner a $ 100,000 loan, and Lynn solicited investments from outside investors and raised over $ 100,000 from the sale of Dexsil stock at $ 200 per share. Prior to the sale of shares to outside investors, the Lynn family owned 100 percent of the shares of petitioner. As of 1983, the directors of petitioner were Lynn, J.S. Lynn, and T.B. Lynn. In 1984, T.D. Lynn received a degree in chemical engineering from the University of Connecticut and became vice president of petitioner. Finch, who was graduated from Colby College with degrees in chemistry/biochemistry and in math-economics in 1983, became the quality control manager of petitioner in 1984. In 1985, Finch was appointed sales manager. In 1985, petitioner adopted a defined benefit pension plan that covered substantially *186 all of its employees. The contributions that were made to the plan were not allocated to the individual participants and represented amounts necessary to meet minimum funding standards for the given plan year. Also in 1985, petitioner outgrew its production facility, and Lynn negotiated and personally obtained a $ 450,000 loan from the Connecticut Development Authority to purchase land and to build a new plant for operations of petitioner. The loan was guaranteed by J.S. Lynn. Petitioner leased the plant from Lynn. In 1985 or 1986, the EPA contacted Lynn about the possibility of the development of a portable test kit for use by EPA enforcement officers to determine the amount of chlorine contamination in used oil. Lynn hired a consultant to assist in the development of a prototype, and Finch directed the project. Lynn determined that the market for a test kit to be used by EPA officials was minimal and thus decided to develop a test kit for use by haulers in testing whether they were in compliance with EPA regulations. The resulting chlorine test kit, "Clor-D-Tect", was introduced for sale in 1987 and was designed to determine whether the contaminants in a given sample were *187 within EPA allowed levels. Subsequently, petitioner introduced a quantitative version of Clor-D-Tect, the Q4000, that determined the specific quantitative measurement of chlorine in a sample. Lynn and Finch were listed as the inventors on the Clor-D-Tect patent. On December 22, 1987, the board of directors of petitioner adopted a Restricted Stock Awards Plan (stock plan) to provide an incentive for key employees to remain in the employ of petitioner. The stock plan was to be administered by a committee that would, from time to time, at its discretion, determine those employees to whom restricted stock awards were to be granted. In 1987, Fisher approached petitioner with an idea for developing a test kit for detecting PCB's in soil. Fisher was hired by petitioner as a consultant and was assigned with Finch to develop the soil test kit. In 1988, petitioner introduced for sale the soil test kit "Clor-N-Soil". Fisher and Finch were listed as the inventors on the Clor-N-Soil patent. In addition to Clor-N-Oil, Clor-D-Tect, and Clor-N-Soil, petitioner also sold chemicals and performed laboratory testing for toxic substances in soil, water, and other substances. The sales figures *188 of petitioner for the fiscal years ended September 30, 1985, through September 30, 1990, were: ($ 000)
Product
1985 1986 1987 1988 1989 1990 Clor-N-Oil
$ 1,809
$ 2,384
$ 2,070
$ 2,003
$ 2,065
$ 2,365
Clor-D-Tect
-  -  111
405
826
1,537
Clor-N-Soil
-  -  -  67
186
194
Chemicals
36
25
76
32
23
120
Analysis
0
37
0
128
79
68
Other
28
50
69
71
206
527
Total
$ 1,873
$ 2,496
$ 2,326
$ 2,706
$ 3,385
$ 4,811
The audited financial statements of petitioner reported the following: Fiscal Year
Net Income
Shareholders' Equity
1981
$   8,628 $    22,628 1982
(21,911)
(1,683)
1983
1,244 99,561 1984
90,056 218,617 1985
268,895 487,512 1986
272,638 760,150 1987
287,386 1,047,536 1988
375,398 1,376,074 1989
413,935 1,773,919 1990
523,160 2,327,937 The records of petitioner indicate that Lynn was paid compensation ranging from $ 4,000 in 1982 to approximately $ 300,000 in 1987. During the years in issue, Lynn served as president of petitioner and worked approximately 60 to 65 hours per week attending sales and research meetings and trade shows; monitoring research and *189 development activities; meeting with the vice president and sales manager; meeting with bankers and lawyers; and maintaining shareholder relations. T.D. Lynn, as vice president, was in charge of the daily operation and computer systems of petitioner. Almost all of the employees of petitioner reported to T.D. Lynn before reporting to Lynn. On December 17, 1988, T.D. Lynn was elected as a director and replaced J.S. Lynn. During the years in issue, Lynn and T.D. Lynn were paid the following: Fiscal Year 1989 Fiscal Year 1990 Employee
Salary
Bonus
Salary
Bonus
Lynn
$ 74,200
$ 302,340
$ 78,000
$ 410,000
T.D. Lynn
50,810
17,437
59,098
58,842
Petitioner had over 20 other employees who also received bonuses during the years in issue. On January 19, 1989, T.D. Lynn received an award of 30 shares under the stock plan; as a director, his signature was on the resolution that granted the award. On April 1, 1989, petitioner hired John D. Mahon (Mahon) to be sales manager. At that time, Mahon was given 30 shares of stock of petitioner, which would be forfeited if Mahon left the employ of petitioner within 5 years, and a stock option for 100 shares. In April *190 1990, Finch, who was then serving as vice president of research, announced his intention to leave petitioner to pursue a Ph.D. Lynn tried to persuade Finch to stay, but Finch declined. Lynn signed a document that provided that petitioner would reinstate Finch's stock awards under the stock plan if Finch resumed his employment with petitioner by the earlier of the completion of his education or 5 years. As of July 1990, Finch was being paid a salary of $ 1,000 per week. Finch received bonuses of $ 9,144 and $ 5,923 for the fiscal years ended September 30, 1989, and September 30, 1990, respectively. In the meantime, Lynn offered Finch's job to his son T.B. Lynn. T.B. Lynn had a Ph.D. in engineering from Yale University and was then employed under a research grant as a staff scientist at the Hermann-Foetinger Institute in Berlin, Germany. T.B. Lynn visited the United States in late July 1990 to discuss the nature of the job with petitioner and also to meet with Finch regarding research projects that were being conducted by petitioner relating to a paper that petitioner was to present. T.B. Lynn was put on the payroll of petitioner as of July 30, 1990, and received $ 1,000 per *191 week through the remainder of that fiscal yearend, September 30, 1990, for a total of $ 9,000. T.B. Lynn was also paid a bonus of $ 20,000 during that same fiscal year. In a submission to respondent, petitioner stated that T.B. Lynn was excluded from receiving stock as a bonus, because he was an officer of petitioner. In another submission to respondent, petitioner stated that there was no document prohibiting officers from receiving stock options but that the committee implementing the stock award plan did not allow directors to receive stock awards. On August 8, 1990, T.B. Lynn returned to Germany and made arrangements with his German employer to complete his research grant project early. On September 10-14, 1990, T.B. Lynn and Finch presented "Electrochemical Analysis of Chlorine Concentration as a Screening Method for PCBs in Oil and Soil" at the International Conference on Organohalogen Compounds. T.B. Lynn remained an employee of the Hermann-Foetinger Institute until October 1990 and resided in Germany until October 25, 1990. During the years in issue, petitioner had three directors: Lynn, T.B. Lynn, and T.D. Lynn. Petitioner began to pay director's fees in 1989; Lynn, *192 T.B. Lynn, and T.D. Lynn were each paid director's fees of $ 6,000 for the fiscal year ended September 30, 1989, and $ 22,000 for the fiscal year ended September 30, 1990. Petitioner deducted director's fees of $ 22,000 and $ 72,000 on its September 30, 1989, and September 30, 1990, income tax returns, respectively. Petitioner paid dividends totaling $ 16,090 and $ 25,992 in its fiscal years 1989 and 1990, respectively. In the notice of deficiency, respondent determined that the deduction by petitioner for compensation was unreasonable during the taxable years ended September 30, 1989, and September 30, 1990, as follows: Fiscal Year Ended
September 30, 1989 Employee Claimed
Allowed
Disallowed
Lynn
$ 382,540
$ 161,192
$ 221,348
Fiscal Year Ended
September 30, 1990 Employee Claimed
Allowed
Disallowed
Lynn
$ 510,000
$ 177,311
$ 332,689
T.D. Lynn
149,940
86,455
63,485
T.B. Lynn
32,550
10,052
22,498
Respondent also determined that the deductions that were claimed in fiscal years 1989 and 1990 for director's fees exceeded a reasonable allowance for director's services. Based on an allowance of $ 100 per director per meeting, respondent *193 allowed a deduction for director's fees of $ 2,000 and $ 3,300 for fiscal years 1989 and 1990, respectively. OPINION Section 162(a)(1) allows as a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered". Section 1.162-9, Income Tax Regs., provides that bonuses paid to employees are deductible "when such payments are made in good faith and as additional compensation for the services actually rendered by the employees, provided such payments, when added to the stipulated salaries, do not exceed a reasonable compensation for the services rendered." Whether an expense that is claimed pursuant to section 162(a)(1) is reasonable compensation for services rendered is a question of fact that must be decided on the basis of the particular facts and circumstances. Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). The burden is on petitioner to show that it is entitled to a compensation deduction larger than that allowed by respondent. Rule 142(a); Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1324 (5th Cir. 1987), *194 affg. T.C. Memo. 1985-267. The cases contain a lengthy list of factors that are relevant in the determination of reasonableness, including: The employee's qualifications; the nature, extent, and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with gross income and net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and the amount of compensation paid to the particular employee in previous years. Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115 (6th Cir. 1949), affg. a Memorandum Opinion of this Court; see also Commercial Iron Works v. Commissioner, 166 F.2d 221, 224 (5th Cir. 1948). No single factor is determinative. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980). When the case involves a closely held corporation with the controlling shareholders setting their own level of *195 compensation as employees, the reasonableness of the compensation is subject to close scrutiny. Owensby & Kritikos, Inc. v. Commissioner, supra at 1324. Compensation of Lynn
Petitioner contends that the compensation that was paid to Lynn during the years in issue was reasonable based on Lynn's role at petitioner; the extraordinary financial success of petitioner; the return on shareholders' equity; a comparison of compensation levels at comparable companies; and because of an alleged "consistently applied compensation plan of petitioner". Petitioner tendered "expert" testimony and relative profitability computations, but the Court ruled that the witness was not qualified as an expert for the purpose of giving an opinion on the reasonableness of compensation paid by petitioner. Moreover, we were not and are not persuaded that the analysis made by petitioner's witness of New York Stock Exchange listed companies permitted meaningful comparisons to petitioner. Respondent contends that Lynn's compensation was unreasonable because Lynn did not play a significant role at petitioner. Specifically, respondent contends that Lynn did not have up-to-date *196 expertise in the environmental science field and, consequently, had to hire individuals with more training. Respondent contends that the reasonableness of Lynn's salary should be evaluated based on a comparison with the salary paid to Finch, because, according to respondent, Finch was as crucial to the success of petitioner as was Lynn. Hiring and managing qualified individuals is, in our view, among the most valuable skills of a chief executive. Although the record indicates that Finch was a valuable employee, we are not persuaded that his role at petitioner is comparable to the services rendered by Lynn, president of petitioner. Respondent also relies on the report of respondent's expert, David J. Bowering (Bowering). In his report, Bowering compared the financial performance and compensation levels of petitioner with industry norms and seven specific "comparable corporations", using published compensation surveys of small companies. Bowering's report is the only objective evidence in the record of levels of compensation in companies that appear to be comparable. It has limited information, however, about noncash compensation or personal or family relationships between employees *197 and shareholders in the other companies. We do not accept all of Bowering's conclusions and make our own best judgment on the record. Bowering reported that, during the years in issue, the return on assets and return on sales of petitioner significantly exceeded industry norms and that petitioner was able to produce much higher profit margins on sales than the comparable group mean and median. Nevertheless, Bowering concluded that Lynn's compensation was unreasonable, because it was over twice the industry median chief executive officer (CEO) compensation for fiscal year 1989; over four times the industry median CEO compensation for fiscal year 1990; and four times the median CEO compensation for the seven comparables during the years in issue. Bowering's calculation of reasonable compensation for Lynn was based on the compensation level of the CEO of Daedalus Enterprises, Inc. (Daedalus), which totaled $ 145,220 in fiscal 1989 and $ 158,962 in fiscal 1990, and was the highest CEO compensation of the seven comparables. Bowering increased the Daedalus amounts by a multiple of 1.5 "to accommodate the significant contribution of Mr. Lynn to the success of the company" and then subtracted *198 an amount representing Lynn's defined benefits contribution. Bowering's maximum reasonable salary for Lynn was $ 196,275 and $ 191,899 for fiscal years 1989 and 1990, respectively. Petitioner contends that Bowering's calculation is flawed in two respects. First, petitioner contends that there is no basis for subtracting from the Daedalus CEO compensation amounts any value attributable to defined benefits contributions. We agree, although the burden of filling in gaps in the evidence is on petitioner. Secondly, petitioner contends that Bowering's multiple of 1.5 fails to account adequately for the profitability of petitioner in earlier years while Daedalus had losses; Lynn's multiple roles at petitioner; Lynn's modest compensation in the earlier years; the payment of dividends by petitioner in 1989 and 1990; and the superior profit performance of petitioner in comparison to the industry. We are satisfied that Lynn provided important management services that significantly contributed to the profitability of petitioner during the years in issue; however, we are not persuaded that the multiple "roles" that petitioner argues were occupied by Lynn are extraordinary for the president *199 of a small corporation. Although the record indicates that petitioner paid bonuses to many other employees, there is no evidence of a set bonus formula, and, thus, we cannot determine whether the bonus awards to the employees of petitioner were determined pursuant to any longstanding, consistently applied compensation plan. Cf. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1247 (9th Cir. 1983), revg. and remanding on other grounds T.C. Memo. 1980-282; Home Interiors & Gifts, Inc. v. Commissioner, supra at 1159. Lynn testified that he met with the accountant of petitioner at the end of each year to determine compensation and that bonus amounts were based on the cash-flow of petitioner. Further, there is no evidence that Lynn's compensation for the years in issue was intended to compensate him for any past undercompensation. Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7. Nevertheless, based on the superior financial performance of petitioner and on the record as a whole, we are *200 persuaded that compensation higher than the amount calculated by Bowering is reasonable. In reaching our best judgment, we conclude that $ 300,000 and $ 320,000 for fiscal 1989 and 1990, respectively, is reasonable. Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. 564, 568 (1974), affd. 528 F.2d 176 (10th Cir. 1975); see also Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). These amounts are consistent with his compensation for prior years and represent approximately 8.7 percent and 6.5 percent, respectively, of the sales of petitioner in fiscal 1989 and 1990, which exceed the mean and median of owner-employee compensation as a percentage of sales for the same years as calculated by Bowering for the seven comparables. Moreover, these amounts exceed the CEO compensation level for the 90th percentile of the industry during the years in issue. These amounts are in addition to unallocated pension plan contributions on his behalf. No greater amounts can be justified on this record. Compensation of T.D. Lynn
Noting that the total compensation of T.D. Lynn (for salary and bonus) increased *201 from $ 68,247 for fiscal year 1989 to $ 117,940 for fiscal year 1990, respondent contends that the fiscal 1990 compensation for T.D. Lynn is unreasonable. Respondent argues that petitioner has not explained any increase in the job responsibilities of T.D. Lynn that would justify the large increase in compensation. Further, respondent contends that the reasonableness of the compensation of T.D. Lynn should be judged against the compensation of Finch. The record indicates that T.D. Lynn, as vice president, had broad managerial responsibilities and was second-in-charge behind Lynn. Finch, on the other hand, had responsibilities in a particular area, which, at the time of his departure, was research. We are not persuaded that T.D. Lynn and Finch had comparable responsibilities. In his report, Bowering stated that the compensation for comparable executives in the seven comparable companies ranged from less than $ 60,000 to $ 131,125 for 1989 and from less than $ 60,000 to $ 139,550 for 1990. With respect to vice presidents in the industry, Bowering noted that the mean salary was $ 76,600 and that the 90th percentile for vice president compensation was $ 158,000. Based on the record *202 as a whole, we are satisfied that T.D. Lynn's 1990 compensation of $ 117,940, which is within the vice president compensation range contained in Bowering's report, is reasonable. Compensation of T.B. Lynn
Petitioner contends that the $ 20,000 bonus that was paid to T.B. Lynn for fiscal year 1990 was a "sign-up" bonus. T.B. Lynn testified that, as an inducement to work for the family business, he negotiated a cash bonus. T.B. Lynn also testified that his bonus was in the form of cash, as opposed to a stock incentive award, because he was on the committee that determines stock incentive awards and, thus, that it would have been inappropriate for him to receive a stock sign-up bonus. The record contains no evidence of any other employee's having received a cash sign-up bonus upon the commencement of employment. There is no evidence that T.D. Lynn received any type of bonus when he decided to work full time at the family business. Further, T.B. Lynn's testimony as to why he received cash instead of stock is contradicted by the submissions from petitioner to respondent and by evidence indicating that T.D. Lynn signed a resolution granting himself stock awards while serving *203 as an officer and director. It appears that the characterization by petitioner of the cash payment as a startup bonus is an afterthought contradicted by prior inconsistent statements of petitioner. We are not persuaded that it constitutes reasonable compensation for services rendered during the years in issue. The balance of compensation paid to T.B. Lynn is reasonable. Director's Fees
Petitioner contends that the director's fees that were paid to Lynn, T.D. Lynn, and T.B. Lynn are reasonable either as separate director's fees or as part of the total compensation received by the employee-directors. We have already determined the reasonable compensation allowances for the employment of Lynn, T.D. Lynn, and T.B. Lynn, and there is no evidence that the director's fees were intended to be compensation for services rendered other than those of a director. Petitioner argues that, because petitioner was financially successful during the years in issue, it is reasonable to conclude that the directors performed their jobs well. However, the record contains no evidence as to the number of director's meetings during the years in issue, the number of directors attending, the scope *204 of the directors' work, or the basis on which director's fees were calculated. Petitioner has failed to prove that respondent's determination with respect to director's fees is erroneous. Decision will be entered under Rule 155.