United States Court of Appeals
Fifth Circuit

**F I L E D**

December 9, 2004

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-61040

BREWER QUALITY HOMES, INC.,

Petitioner-Appellant,

VERSUS

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

Appeal from the United States Tax Court

( 1:02-CV-110-Ro )

Before DeMOSS, STEWART, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Brewer Quality Homes ("BQH") was issued a statutory notice of deficiency by the Internal Revenue Service ("IRS" or "Commissioner") for BQH's corporate income tax returns filed for fiscal years 1995 and 1996. BQH sought a redetermination of the deficiencies with the United States Tax Court. The Tax Court found that BQH was not permitted to deduct certain compensation paid to Jack Brewer (BQH's founder, principal officer, and 50% shareholder) because that compensation was not reasonable in amount, determining that the excess monies paid Brewer by BQH constituted a disguised

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

dividend.  BQH timely filed the instant appeal.

**BACKGROUND AND PROCEDURAL HISTORY**

BQH was incorporated in 1977 in Bossier City, Louisiana, as a retail seller of mobile homes.  Jack Brewer ("Mr. Brewer") and his wife, Mary, each owned fifty percent of BQH's stock, which is not publicly traded.  Mr. Brewer started BQH as a sole proprietorship in 1973, using equity from his home in addition to a bank loan. BQH has alternated its corporate form several times since its inception, going from an S Corporation in 1987, to a C Corporation in 1988.  BQH returned to an S Corporation in 1989 through 1993, when it again reverted to a C Corporation.

During the early 1970s, the 1980s, and the early 1990s, BQH survived several economic downturns that ultimately caused many mobile home dealers in BQH's region of the country to go out of business.  BQH was able to take advantage of the financial distress experienced by his competitors and purchased many mobile homes from them at favorable prices.  Over the years, BQH was involved in the retail sales of approximately twenty different brands of mobile homes, and in 1995 and 1996, the years at issue here, BQH's principal product was the Fleetwood Homes line.  During the market year from 1995-1996, BQH was ranked thirty-sixth nationally among the 1,300 Fleetwood Homes retailers.  The following market year, 1996-1997, BQH was ranked first among Fleetwood Homes dealers in the state of Louisiana and thirteenth nationally.  In addition to the actual sales of mobile homes, BQH began, in the early 1990s,

2

offering its customers financing and insurance, both of which were underwritten by BQH. BQH, therefore, began realizing profits from interest on the loans it made and from commissions for the insurance policies it issued its customers.

While Mr. Brewer was BQH's only employee in its first year, by the early 1990s, BQH employed approximately sixteen individuals. By 1996, BQH had twenty-two employees, seven of whom were in sales. In 1993, while still an S Corporation, BQH distributed $116,100 to its only two shareholders (Mr. and Mrs. Brewer). In 1994, BQH, then a C Corporation, distributed $320,949 to the Brewers. Up to the end of the 1996 fiscal year, the 1993 and 1994 distributions were the only ones made by BQH. While BQH did not have an official or written salary policy or bonus plan, it operated under a general policy of paying compensation equal to or higher than comparable companies in its market.[1]

In 1995 and 1996, BQH paid its employees, other than Mr. Brewer, annual salaries ranging from $18,000 to $75,407. In 1995, BQH paid Mr. Brewer an annual salary of $62,186 in addition to $700,000 paid on December 31, 1995, as a bonus. Similarly, in 1996, BQH paid Mr. Brewer an annual salary of $63,559 and, on December 31, 1996, paid Mr. Brewer $800,000 as a bonus. Mr. Brewer's compensation in 1995 represented 82% of BQH's taxable income for that year, while Mr. Brewer's 1996 compensation

---

[1] BQH also offered its non-shareholder employees with paid health insurance, sick leave, and vacation leave.

accounted for 85% of BQH's total taxable income for 1996.[2]  In sum, BQH paid and deducted total compensation to Mr. Brewer of $762,186 in 1995 and $863,559 in 1996.

The IRS commenced an audit of BQH for fiscal years 1995 and 1996 and, in February 1999, issued BQH a statutory notice of deficiency in February 1999.  The sole issue raised in the notice was whether the compensation paid by BQH to Mr. Brewer during the two years in question were fully deductible by BQH.  The notice also contained the IRS's proposed adjustments to BQH's corporate income tax returns.  Although the IRS eventually made concessions by allowing BQH to deduct compensation paid to Mr. Brewer in the amounts of $604,117 for 1995 and $485,966 for 1996, BQH nevertheless filed a petition in United States Tax Court, seeking a redetermination of the deficiencies alleged by the IRS.

The case was tried over the course of three days in June 2000. A total of four witnesses testified at trial, including Mr. Brewer, Jack Sledge (Mr. Brewer's accountant, who was called as an expert witness), Mae Lon Ding (an expert called by BQH), and Dr. Scott Hakala (the IRS's expert witness).  Not surprisingly, Sledge and Ding produced expert reports concluding that Mr. Brewer's compensation was reasonable, while Hakala testified that the amounts paid to Mr. Brewer were excessive.  On July 10, 2003, the

_____

[2] The taxable income figure used in this example is the amount of taxable income before the deduction of Mr. Brewer's claimed compensation.

4

Tax Court issued a memorandum opinion in which it determined that BQH could deduct not more than $610,000 as reasonable compensation for Mr. Brewer for 1995, and not more than $630,000 as reasonable compensation for 1996. The Tax Court thereafter entered its decision in accordance with its memorandum opinion and BQH filed this subsequent appeal.

## DISCUSSION

**I.     Whether the notice of appeal mailed on November 25, 2003, and filed on December 1, 2003, was timely.**

A panel of this Court directed the parties to brief the issue of whether the notice of appeal was timely. Both parties complied with this directive and now agree that such notice was filed within all applicable deadlines. Nevertheless, a brief summary of why the appeal was timely follows.

Under FED. R. APP. P. 13(a)(1), a notice of appeal from a tax court is timely if it is filed within ninety days of the decision. If the notice of appeal is sent by mail, it is considered filed on the postmark date. FED. R. APP. P. 13(b).[3] Here, the Tax Court entered its decision on August 27, 2003. BQH filed its notice of appeal by mailing the required notice to the Tax Court Clerk of Court, properly addressed, in an envelope suitable for mailing, via

---

[3] While the date of the mailing will be normally controlled by the postmark date, this rule is subject to exceptions found in § 7502 of the Internal Revenue Code. 26 U.S.C. § 7502. Based on a review of § 7502, however, none of the exceptions have any applicability in this case.

5

certified mail, return receipt requested, on November 25, 2003 – exactly ninety days from the date the Tax Court entered its decision. While the photocopy of the envelope in which the notice of appeal was mailed apparently did not show a legible postmark, BQH later provided a photocopy of the certified mail receipt showing a postmark of November 25, 2003. In light of the photocopied receipt, it is agreed between the parties that the notice of appeal was timely filed.

**II. Whether the Tax Court clearly erred in finding that the amounts paid as compensation to BQH's founder and president were unreasonable and therefore not entirely deductible under the Internal Revenue Code.**

The Tax Court's determination of whether compensation paid by a corporation is reasonable is a question of fact that will not be reversed unless it is clearly erroneous. Rutter v. Cmm'r, 853 F.2d 1267, 1271-72 (5th Cir. 1988). A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. Id. at 1272 (quotations and citation omitted). The definition and application of the appropriate factors the Tax Court considers in making its determination is reviewed de novo. Id.

Section 162(a)(1) of the Internal Revenue Code permits a corporation to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered." 26 U.S.C. § 162(a)(1). It follows, therefore, that "the test for deductibility

6

in the case of compensation payments is whether they are reasonable and are in fact payments purely for services." Treas. Reg. § 1.162-7(a).[4]  A deduction for compensation that is, in fact, reasonable is an amount "as would ordinarily be paid for like services by like enterprises under like circumstances." Id. § 1.162-7(b)(3).  Here, there is no dispute that Mr. Brewer actually performed services for BQH.  In fact, there was evidence presented to the Tax Court that Mr. Brewer has exercised complete control over BQH since it was founded and has fulfilled many roles within the corporation. The focus of our inquiry, therefore, is on the reasonableness of the compensation paid to Mr. Brewer by BQH.

The Tax Court's reasonableness inquiry is governed by the nine-factor test set forth in Owensby & Kritikos, Inc. v. Cmm'r, 819 F.2d 1315 (5th Cir. 1987).  These factors include

> the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with gross income and net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; [and] the salary policy of the taxpayer as to all employees.

Id. at 1323 (alteration in original).

No single factor is decisive of the question; rather the trial court must consider and weigh the totality of the facts and

_____

[4] The two-part deductibility test is designed generally for corporations "having few shareholders, practically all of whom draw salaries." Treas. Reg. § 1.162-7(b)(1).  The close-corporation structure contemplated by the Treasury Regulations applies to BQH's corporate form in the instant case.

circumstances in determining reasonable compensation. Id. Also, the Commissioner's determination of reasonableness carries a presumption of correctness, placing the burden on the taxpayer to establish that he is entitled to a deduction larger than that allowed by the Commissioner. Id. at 1324.

BQH contends that while the Tax Court properly identified the nine-factor test adopted by this Court, it nevertheless failed to provide even a minimal analysis and application of those factors. BQH specifically argues that although the Tax Court considered ten "indicia" of reasonable compensation, with five in favor of BQH and five in favor of the IRS, those "indicia" can only be roughly related to the nine factors the Tax Court was obligated to consider. The IRS responds that the Tax Court carefully considered all the factors discussed in Owensby & Kritikos, and points to the record as providing the necessary support for each of the Tax Court's findings.

As a preliminary matter, it should be noted that while BQH repeatedly argues throughout its brief that the Tax Court's analysis is only "roughly related" to the nine-factor test, it provides no specific reasons to support this contention. In fact, BQH only raises arguments as to two of the factors in the nine-factor inquiry: (1) dividend practices and return on equity; and (2) the prevailing rates of compensation for comparable positions

in comparable concerns.[5]  Even in the absence of any specific critique on behalf of BQH, this opinion nevertheless addresses the analysis and application of the relevant factors employed by the Tax Court to determine whether its decision was clearly erroneous.

1.  <u>Mr. Brewer's Qualifications</u>

As mentioned previously, it is undisputed between the parties that Mr. Brewer was qualified for the different positions he held at BQH.  The Tax Court observed this fact as well and determined that this factor weighed in favor of a relatively high compensation for Mr. Brewer.

2.  <u>Nature, Extent, and Scope of Mr. Brewer's Work</u>

The Tax Court found that Mr. Brewer worked long hours and that his hard work was the driving force behind BQH's success, noting Mr. Brewer's ability to fulfill numerous roles, including serving as BQH's president, chief financial officer, chief executive officer, general manager, sales manager, loan officer, credit manager, purchasing officer, personnel manager, advertising manager, insurance agent, and real estate manager.  The Tax Court also determined that through Mr. Brewer's "enthusiasm, hard work, and dedication, he built [BQH] into a successful enterprise."  As such, the Tax Court concluded that this factor weighed in favor of

---

[5] BQH appears to want this panel to determine that the Tax Court did not apply the appropriate factors so that we will conduct a <u>de novo</u> review of the case, instead of the clearly erroneous standard that would be applicable if it were concluded that the Tax Court properly considered all relevant factors.

a high compensation for Mr. Brewer. Tempering this finding, however, this Court has observed that "[n]onetheless, limits to reasonable compensation exist even for the most valuable employees." Rutter, 853 F.2d at 1272.

### 3. Size and Complexity of BQH

The Tax Court recognized the growth BQH made over the years, especially noting the substantial success it enjoyed beginning in the early 1990s. The Tax Court cited BQH's rise in the national rankings among Fleetwood Homes retailers as evidence of this fact. The Tax Court also noted the different aspects of BQH's operations, specifically observing BQH's foray into the financing and insurance aspects of mobile home sales. In sum, the Tax Court made a determination that this factor favored a higher compensation for Mr. Brewer.

### 4. Comparison of Mr. Brewer's Salary with Gross & Net Income

The Tax Court found that the claimed compensation BQH paid to Mr. Brewer in 1995 and 1996 constituted 8.5% and 8.7%, respectively, of BQH's gross sales and 82% and 85%, respectively, of BQH's taxable income. The Tax Court employed financial ratios in its various computations from the Robert Morris Associates ("RMA") report, a resource for the mobile home industry, which provides data on, among other things, executive compensation as a percentage of sales for companies comparable to BQH. The Tax Court determined that the RMA study of comparable companies revealed a median value of compensation as a percentage of gross sales as 2.3%

for 1995 and 1.8% for 1996. Nevertheless, the Tax Court did not rely on the median value in reaching its decision, relying instead on the values accorded to the 90th percentile of officer compensation payments, a reflection of the Tax Court's earlier finding regarding BQH's financial successes during the years in question. The Tax Court even accepted BQH's expert witness's suggestion that the percentage of gross sales for 1995 and 1996 were 6.0% and 6.3%, respectively. Nonetheless, the Tax Court determined that Mr. Brewer's compensation percentages were substantially higher than the figures urged by BQH's expert, thus leading the Tax Court to conclude that reasonable compensation would have been significantly less than BQH's actual payments to Mr. Brewer.

After making this determination, the Tax Court multiplied BQH's sales by the corresponding RMA ratio for each year in question to arrive at the appropriate compensation amounts for the services Mr. Brewer performed for BQH: $520,000 in 1995 and $600,000 in 1996. The Tax Court thereafter added $5000 to the 1995 amount to account for Mr. Brewer's guaranty of a bank loan to BQH that year, and added 5% of Mr. Brewer's newly-calculated compensation to make up for the absence of retirement benefits. The total amount of reasonable compensation for Mr. Brewer as determined by the Tax Court was ultimately $610,000[6] for 1995 and

---

[6] The IRS's expert witness offered a formula and a corresponding dollar figure that attempted to redetermine Mr.

11

$630,000 for 1996.

### 5.  Prevailing General Economic Conditions

The Tax Court noted in its findings of fact that BQH had survived several economic downturns, evidencing BQH's resilience. The Tax Court specifically recognized Mr. Brewer's efforts in ensuring BQH's ability to survive those conditions, and as such found this factor favored a relatively high compensation.

### 6.  Comparison of Salaries with Distributions to Stockholders

In 1993, BQH distributed $116,100 to its only two shareholders (Mr. and Mrs. Brewer).  In 1994, BQH distributed $320,949 to the Brewers.  Up to the end of the 1996 fiscal year, the 1993 and 1994 distributions were the only ones made by BQH.  The Tax Court was troubled by the fact that the profitability of BQH was considerably higher in 1995 and 1996 than previous years, yet BQH did not make any distributions whatsoever.  By paying compensation to Mr. Brewer in the amounts BQH did in 1995 and 1996, the Tax Court concluded that this factor weighed heavily in favor of a low compensation for Mr. Brewer.

### 7.  Compensation for Comparable Positions in Comparable Concerns

The Tax Court determined that Mr. Brewer received compensation

---

Brewer's reasonable compensation.  The IRS relied upon this formula and the Tax Court accepted the recommendation offered by the expert.  It turned out, however, that based on mathematical errors committed by the expert, the actual compensation figure for 1995 was higher than initially represented.  Therefore, the upward correction was made on favor of BQH, raising the amount deductible from $550,00 to $610,000.

higher than those executives in comparable companies. BQH argues that the Tax Court failed to consider that Oakwood Homes, a BQH competitor, would have paid Mr. Brewer over $800,000 per year in both 1995 and 1996. In support of its argument, BQH cites a recruiting advertisement issued by Oakwood Homes in which it asks, "Have you ever wondered what it would be like to work with a company whose top sales personnel earn more than $100,000 a year, and whose top sales managers earn more than $800,000?" BQH also cites a letter written by Thom Cross, a vice-president of Oakwood Homes, in which Mr. Cross apparently states that Oakwood Homes was paying people in BQH's region the salaries quoted above and that Oakwood Homes would be interested in hiring Mr. Brewer and give him a compensation package that would allow him to make up to $800,000 per year.

In response, the IRS's expert witness testified that the advertisement reflected salaries for what a mobile home manufacturer or retailer with annual sales of $100 million or more would pay its most senior and successful sales executives. BQH, by contrast, had sales during all relevant time periods of between $9 and $10 million. Also, the IRS points to the fact that Mr. Cross was not called by BQH to testify as to Oakwood Homes' desire to hire Mr. Brewer for the amounts stated. Moreover, the IRS suggests that by not calling Mr. Cross to testify, it is impossible to determine to what extent the advertisement's vague language concerning salary ranges represents "recruiting hyperbole" and to

what extent it represents actual compensation.

The Tax Court relied instead upon the RMA data, which systematically draws from numerous companies across the industry and permits objective comparisons between executive compensation and company performance. It is also noteworthy that both parties relied almost exclusively upon the RMA ratios, but, on appeal, BQH shifted its focus to address only its argument regarding the Oakwood Homes advertisement. In sum, the speculative nature of the Oakwood Homes advertisement cannot replace the RMA formulaic approach both parties initially adopted and upon which the Tax Court ultimately relied.

8.    Salary Policy of BQH as to All Employees

As discussed previously, BQH did not maintain an official salary policy for any of its employees, including Mr. Brewer. The Tax Court expressed concern that because Mr. Brewer essentially controlled BQH, he was able to set his own compensation. While the IRS concedes that BQH paid its employees salaries equal to or greater than those paid by its competitors,[7] it argues the wide disparity between the salary paid Mr. Brewer and the next highest-paid employee supports a low compensation amount.

Substantial bonuses declared at the end of the year when the earnings of a business are known usually indicate the existence of disguised dividends. Owensby & Kritikos, 819 F.2d at 1329 (citation

---

[7] BQH's highest-paid employees earned salaries in the $70,000 range.

14

omitted).  Moreover, this Court has previously determined that, especially in the context of closely held corporations, "it is in the tax interest of all parties to characterize the amounts distributed to shareholders/officers as compensation rather than dividends." Rutter, 853 F.2d at 1270.  Because the "[d]istribution of profits through compensation payments to shareholder/officers avoids the double tax on corporate profits which are distributed to shareholders as dividends," the concern arises where corporations distribute their profits through the payment of unreasonably large salaries and bonuses to those controlling shareholder/officers. Id. at 1271.  Therefore, it is necessary to "carefully scrutinize the payments to ensure that they are not disguised dividends." Owensby & Kritikos, 819 F.2d at 1324.

In Owensby & Kritikos, the two principal shareholder/officers "exerted substantial influence over these 'discretionary bonuses,'" which the court observed involved amounts of money that "were not the result of a longstanding compensation formula and could hardly be considered contingent compensation in the fullest sense of that term." 819 F.2d at 1329.  Similarly, Mr. Brewer clearly held a position of unmatched control and influence over the business decisions at BQH.  Furthermore, because BQH admittedly did not have any type of written compensation policy, it becomes hard to argue, as BQH does, that the amounts of the bonuses paid Mr. Brewer were part of a "contingent compensation" arrangement.

     9.    Amount of Compensation Paid to Mr. Brewer in Previous

15

<u>Years</u>

BQH argued before the Tax Court that it underpaid Mr. Brewer in previous years, particularly in 1992 and 1993. The Tax Court rejected this argument, finding persuasive the absence of any corporate minutes reflecting any mention of BQH's intention to compensate Mr. Brewer for past years of undercompensation. Moreover, the Tax Court noted that neither of BQH's experts could provide any credible testimony regarding the alleged underpayments or the specific years in which they occurred, stating that BQH's "theory of compensation for prior services [appeared to be] only an afterthought developed at a time when the reasonableness of the compensation was already under attack."

Admittedly, the Tax Court does not perform its reasonable compensation analysis in a factor-by-factor manner much like the court in <u>Owensby & Kritikos</u> did. On the other hand, the fact-finding done by the Tax Court fleshes out many of the relevant items that support its ultimate redetermination of reasonable compensation for Mr. Brewer. A similar type of situation existed in <u>Rutter</u>, where the taxpayer argued that the tax court did not specifically apply each of the nine factors identified in <u>Owensby & Kritikos</u>. <u>Rutter</u>, 853 F.2d at 1271. Instead, the taxpayer argued, the tax court relied solely on the reports and testimony of expert witnesses regarding only one factor — the prevailing rates of compensation for comparable positions in comparable concerns — and did not consider or weigh any of the other eight factors in

16

reaching its decision.  Id.  This Court observed that the tax court's opinion reflected its awareness of the relevant factors and that the tax court made findings of fact as to each of them, some of which were considered extensive. Id. at 1272.

Here, the Tax Court cited Owensby & Kritikos nine times throughout its analysis, suggesting both that it was fully aware of the relevant precedent and that it considered the necessary factors in arriving at its conclusion.[8]  As discussed above, the Tax Court also made extensive findings of fact relating to all nine factors. Nevertheless, Rutter held that it was not clearly erroneous for a court to consider some of the factors "without an extensive detailed written analysis." 853 F.2d at 1272.  The Tax Court here has engaged in a thoughtful, well-reasoned analysis that incorporated, inter alia, the testimony and written reports provided by the various experts, while commenting on all the relevant facts necessary to make a reasonable compensation determination.

## CONCLUSION

We conclude that the notice of appeal mailed by BQH on November 25, 2003, and filed on December 1, 2003, was timely. Further, we conclude that the Tax Court properly identified the appropriate standard for determining whether compensation paid an

---

[8] In fact, the Tax Court specifically states: "In determining the maximum reasonable compensation for [Mr. Brewer]'s services for the years in issue, we have considered the relevant factors listed in Owensby & Kritikos, Inc. v. Commissioner."

17

employee was reasonable.  Thus, under the clearly erroneous standard, the Tax Court's decision in redetermining Mr. Brewer's reasonable compensation was proper.  Nevertheless, even if we were to conclude that the Tax Court did not properly apply the relevant standard to the facts here, under a <u>de novo</u> review, the Tax Court's decision comports with the stated purposes in the relevant Treasury Regulations, the Internal Revenue Code, and this Circuit's precedent.  We therefore AFFIRM the decision of the Tax Court for the reasons cited in its memorandum opinion.

AFFIRMED.